IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 63 MAP 2017 |
| | : |
| Appellee | : Appeal from the Order of the Superior |
| | : Court at No. 245 MDA 2016 dated |
| | : April 21, 2017 Reversing and |
| v. | : Remanding the PCRA Order of the |
| | : Dauphin County Court of Common |
| | : Pleas, Criminal Division, at No. CP- |
| ERIC EUGENE SMALL, | : 22-CR-1458-2011 dated January 19, |
| | : 2016. |
| Appellant | : |
| | : SUBMITTED: March 20, 2018 |

## OPINION

**JUSTICE DOUGHERTY**                                    **DECIDED: July 18, 2018**

In this discretionary appeal, we consider the meaning of "merely corroborative or cumulative evidence" in the context of determining whether a new trial is warranted based on after-discovered evidence.

### I. Background

In the early morning hours of March 7, 2011, William Price was killed after he suffered a contact gunshot to the left side of his head while he was outside Club Egypt, a nightclub in Harrisburg, Pennsylvania. No one saw the shooting, but a number of witnesses saw Eric Small ("appellant") walking away from the nightclub with his right arm around Price only moments before the fatal gunshot. From this and other evidence detailed below, police identified appellant as the shooter, and the Commonwealth

charged him with first-degree murder and violations of the Pennsylvania Uniform Firearms Act, 18 Pa.C.S. §§6101-6127.

The identity of the shooter was the focal point of appellant's trial. The Commonwealth contended appellant killed Price, but the defense argued the shooter was actually Pedro Espada ("Espada"), appellant's friend who was also outside the nightclub just before the shooting. Because the after-discovered evidence at issue in this appeal directly implicates these conflicting viewpoints, we begin by reviewing the trial evidence supporting each alternative theory.

*A. The Commonwealth's Theory at Trial*

The Commonwealth's theory of the case revolved around appellant and Espada's close relationship. As multiple witnesses described it, the two were like foster brothers, with Espada having grown up with appellant and his sister, Lisa Small. Notes of Testimony ("N.T.") 8/7/12, 192-94; N.T. 8/8/12, 125-26. It was out of loyalty to Espada, the Commonwealth contended, that appellant shot Price, after he learned Price had assaulted Kenosha Tyson, the mother of Espada's children.[1]

At trial, Tyson detailed Price's assault on her, which occurred two days before the murder at another nightclub in Harrisburg known as The Rebound. N.T. 8/7/12, 146-47.[2] Tyson explained she was at The Rebound with Lisa Small and several other friends when Price, whom she did not know, pushed her and pulled her hair as she tried to walk by him. *Id.* at 126-28. Although Tyson never told Espada about this incident — the two were no longer in a relationship at that point — he and appellant nevertheless found out about it by the time they encountered Price at Club Egypt two nights later. *Id.* at 130, 149-50.

---

[1] The trial transcripts incorrectly identify Tyson's first name as "Keaosha."

[2] As discussed *infra*, although Tyson testified as a Commonwealth witness at trial, she is also the source of appellant's after-discovered evidence claim.

With this motive as a backdrop, the Commonwealth presented multiple witnesses who were with appellant prior to or after the shooting. Each witness supplied some piece of circumstantial evidence linking appellant to Price's murder.

Ali Williams, Lisa Small's boyfriend, testified appellant and Espada "kept looking at [Price]" after they spotted him inside Club Egypt. N.T. 8/8/12, 85. When Williams heard appellant talking to Espada in a hushed manner and saw him moving his hand around, he asked what they were talking about. *Id.* at 85-86. Espada told him not to worry about it. *Id.* Later, as the nightclub was closing, appellant, Williams, Espada, and the rest of their group exited around the same time. *Id.* at 86-87. Once outside, Williams saw appellant approach Price — who was talking with his friend, Shamar Evans — and heard appellant tell Price he wanted to speak with him. *Id.* at 87. Appellant proceeded to put his right arm around Price and lead him down the street; Evans, meanwhile, continued to the car Garrett Gibson had pulled up for him and Price. *Id.* at 87-88. At that point, Williams noticed appellant "had something . . . in his left hand." *Id.* at 88. Moments later, as Williams briefly turned to cross the street, he "heard a pow." *Id.* He turned back around and saw appellant standing over Price's shaking body before appellant ultimately fled in the direction of the riverfront. *Id.* at 88, 90.

According to Evans's testimony, he had just exited the nightclub with Price when a man wearing clothing similar to that described by other witnesses as matching appellant's outfit, grabbed Price and put his arm around his shoulder. N.T. 8/7/12, 206-08. Price told Evans he was fine, so Evans continued to Gibson's car. *Id.* at 211; N.T. 8/8/12, 21-23. As Evans began to sit inside, he looked up and saw Price falling on his back. N.T. 8/7/12, 208. Evans alerted Gibson and the two exited the car and ran to Price. *Id.* at 208-09; N.T. 8/8/12, 24. When they saw Price's eye was "swollen," they began to chase the person Evans had seen with his arm around Price moments before

the shooting. N.T. 8/7/12, 209, 213, 221. They stopped following the man when they turned into a dark alleyway and someone fired two more gunshots. *Id.* at 213-15, 222; N.T. 8/8/12, 25-27.

Lisa Small similarly testified she saw appellant with his right arm "wrapped around" Price as the pair walked away from the nightclub towards the corner. N.T. 8/7/12, 156. When she turned to face her car, she heard a gunshot. *Id.* at 162. She looked back and saw Price lying on the ground. *Id.* In a signed and recorded statement to police, she stated appellant was the only person she saw near Price immediately after she heard the gunshot, and that she watched Evans and Gibson chase appellant towards the riverfront. *Id.* at 173-74, 179-81.

Andre Knight, another friend of appellant and Espada's, testified he was standing in front of Club Egypt when he saw appellant approach Price and put his arm around him. N.T. 8/8/12, 48-50. As Knight began to cross the street, he heard a gunshot. *Id.* at 50. He turned and saw appellant running towards the river, with Price's two friends (Evans and Gibson) chasing after him. *Id.* at 58-59. Knight testified he reunited with several members of their group — including appellant — on a nearby street shortly after the shooting. *Id.* at 60-62, 75-76. The group went to Lisa Small's apartment. *Id.* at 61.[3] There, Knight heard appellant laughing and telling his friends, "Cuz got what he deserved." *Id.* at 61-62. Knight further heard appellant say, "[w]e did what we had to do," before instructing them to "[k]eep the girls in check[,]" *i.e.*, "[m]ake sure they don't say nothing." *Id.* at 63. When confronted with a signed statement he gave to police, Knight admitted he previously stated appellant also told them "if it came down to it, pin it on my boy Dro." *Id.* at 65. Knight explained "Dro" is Pedro Espada's nickname. *Id.* at 43.

---

[3] Williams's testimony differed from Knight's on this point. Williams explained appellant showed up at Lisa Small's apartment following the shooting, but that he came by himself after the rest of the group had already arrived. N.T. 8/8/12, 92.

Several police witnesses provided circumstantial evidence implicating appellant as the shooter as well. Officers Ed Grynkewicz and Ryan Yarnell testified they followed several tracks of footprints in the snow, one of which led from the crime scene, to the riverfront, and then back to appellant's apartment complex. N.T. 8/7/12, 37-46, 73-76. No one answered when the officers knocked and announced their presence at that location. *Id.* at 76. A few hours later, however, Detective John O'Connor returned to canvass the apartment complex when an officer on his team heard noises inside appellant's apartment. *Id.* at 83-85. Appellant emerged from the apartment a few minutes later. *Id.* at 85. When the officers spoke with him and asked if he heard their previous knocking, he acted "really nervous" and "[j]umpy." *Id.* at 85-86.

Forensic evidence was also central to the Commonwealth's theory of the case. Dr. Wayne Ross, a Forensic Pathologist, testified the cause of Price's death was a gunshot wound to the head and the manner of death was homicide. N.T. 8/7/12, 28-29. Dr. Ross explained the fatal bullet entered "the left side of [Price's] face just next to the left eye" and exited the right side of his head. *Id.* at 21-22. Importantly, he described finding soot around the wound, which indicated it was a "contact gunshot wound," meaning the "barrel [of the gun] was jammed up or pressed into the face." *Id.* at 22. According to Dr. Ross's expert opinion, the gun that killed Price had to be pressed into the left side of his face in order to leave the soot and barrel impression he examined. *Id.* at 26-27.[4]

---

[4] Given how close to Price the shooter must have been, Detective Donald Heffner examined appellant's clothing for forensic evidence, including blood and gunshot residue. N.T. 8/9/12, 42-43. However, appellant admitted he had changed his t-shirt by that point, and Detective Heffner observed appellant's other clothes looked as if they had been washed, as there was no sign appellant "had gone 17 blocks in snow and slush and road salt in those [*sic*] clothing." *Id.* at 43. Detective Heffner also believed appellant had changed into a brand new pair of tennis shoes. *Id.*

In addition to circumstantial evidence, the Commonwealth presented some direct evidence of appellant's guilt through the testimony of two witnesses to whom appellant confessed about killing Price.

Kenneth Hibbert, an inmate who shared a cell with appellant at the Dauphin County Prison, testified appellant told other inmates he was walking with his arm around Price when Price was murdered. N.T. 8/9/12, 10-11. In private, appellant admitted to Hibbert he was the shooter, telling him on at least two occasions he "killed William Price for Pedro [Espada] and turned William Price's face into hamburger meat." *Id.* at 12. After appellant learned Hibbert had conveyed those admissions to police, he threatened to kill Hibbert "like he killed William Price." *Id.* at 13. Sergeant Kyle Bahoric of the Dauphin County Prison testified he overheard one such threat after appellant and Hibbert got into an argument, during which appellant stated, "Put him in his cell and I will kill him, too." *Id.* at 19-20.

Jeffrey Reid also shared a cell with appellant at the Dauphin County Prison. N.T. 8/9/12, 25, 27. Reid testified that, after appellant was arrested, he offered to trade a .25 caliber handgun for Reid's 9mm handgun. *Id.* at 25-26. Appellant told Reid he "needed to get rid of" the .25 caliber handgun because it was "hot[,]" which Reid understood to mean a crime had been committed with it — specifically, the murder of Price. *Id.* at 26. When Reid asked appellant about Price's murder, appellant told him Price "had problems with [appellant's] sister and his boy [Espada]." *Id.* at 27.[5] Appellant then admitted "he shot [Price] in his head." *Id.* As appellant explained it to Reid, "the beef really started" at The Rebound, but "it ended at [Club] Egypt." *Id.* at 28. Reid testified appellant confessed

---

[5] There was evidence Price got into an altercation with Lisa Small the same night he assaulted Tyson. *See* N.T. 8/7/12, 148-49 (Lisa Small testifying she was aggravated Price had "bumped" her multiple times while at The Rebound).

four or five times to killing Price, and he made several threats to other inmates that he "could do the same thing to them." *Id.*

### B. The Defense's Theory at Trial

The defense did not present any witnesses of its own, but relied on the Commonwealth's witnesses to establish its theory Espada was the shooter.

With respect to motive, the defense highlighted the fact Tyson and Espada had two children together, the most recent of which was born only two weeks before Price assaulted Tyson. N.T. 8/7/12, 131-32. At least one witness testified Espada was more upset over Price's assault of Tyson than appellant was, thus implying Espada had a stronger incentive to kill Price. N.T. 8/8/12, 132.

The defense also demonstrated Espada was in the vicinity when appellant led Price down the street with his arm around his shoulder. Williams testified he saw Espada walking behind and to the left of appellant and Price just before the shooting. N.T. 8/8/12, 89, 101. Knight similarly stated he saw Espada following behind the men, with "a little space" between them. *Id.* at 54. In addition, Lisa Small testified she saw Espada walking at "a fast pace" in the direction of appellant and Price before the fatal gunshot. N.T. 8/7/12, 161.

Williams, Knight, and Lisa Small provided other circumstantial evidence against Espada as well. Lisa Small testified she saw Espada fire twice at Evans and Gibson as he fled from them towards the river. N.T. 8/7/12, 177.[6] Williams corroborated this testimony to the extent he testified he saw the two men chase after Espada, rather than appellant. N.T. 8/8/12, 100. Moreover, Williams testified Espada later told another individual, Anthony Miller, where he had stashed a gun near the riverfront. *Id.* at 101-03.

---

[6] This testimony was contrary to her signed statement to police, in which she stated she saw Evans and Gibson chase appellant. N.T. 8/7/12, 178-79.

At some point after the murder, Williams accompanied Miller, Knight, and another friend to that location and retrieved the weapon. *Id.* Finally, Knight testified he had seen Espada with guns in the past, and explained the members of their group frequently passed them around. *Id.* at 72-73.

As for the police witnesses, the defense elicited testimony suggesting Espada was once the target of their homicide investigation. Officer Yarnell testified he traced a second pair of footprints in the snow from the murder scene to Espada's apartment. N.T. 8/7/12, 69, 80. This evidence led Detective O'Connor to later execute a search warrant at that residence. *Id.* at 88-89. He also enlisted appellant to record a phone call with Espada in an attempt to procure evidence against him, but the endeavor was unsuccessful. *Id.* at 89-90. Detective Ryan Neal was similarly unsuccessful in his effort to have Erica Small, another sister of appellant's, record a phone call with Espada. N.T. 8/8/12, 12.

To counter the Commonwealth's direct evidence against appellant, the defense's strategy was twofold. First, it sought to impeach Hibbert and Reid — who stated appellant confessed to them while in prison — by demonstrating they testified against appellant to obtain favorable treatment in their own pending cases. N.T. 8/9/12, 15-17, 30-32. Second, and most relevant to this appeal, the defense emphasized there was also evidence Espada himself had, on at least two occasions, confessed to the murder.

Espada first confessed in a phone call to Jasmine Spriggs, his then-girlfriend, during which he told her "he didn't know what to do and he didn't mean to shoot [Price.]" N.T. 8/8/12, 11. Spriggs did not convey this confession to police directly. *Id.* Instead, Lisa Small, who learned of Espada's confession through Spriggs, relayed that fact to Detective Neal while giving a voluntary, second statement to police one week after the murder, at the urging of appellant's family. *Id.* at 8-9, 11.

Deleon Dotson, who was part of appellant and Espada's group of friends and was incarcerated for an unrelated incident at the time of the murder, described Espada's second confession. N.T. 8/8/12, 119-22. He testified that he learned of the murder when he called Espada from prison the day it happened. *Id.* at 132. At that time, Espada told him he "can't talk right now" and that he "might be out at the county [prison] with [him]." *Id.* On another occasion, Dotson testified, Espada provided more details, explaining "he walked up beside [appellant], walked around his left side, and . . . just pointed the gun and shot" from "about 3 to 5 feet away." *Id.* at 134-35. Espada also told Dotson appellant had "bought that," meaning appellant had taken the blame for the murder even though he did not commit it. *Id.* at 136. Despite these admissions, Dotson testified he did not believe Espada killed Price; instead, he believed Espada was "puffing" or bragging to gain street credibility. *Id.* at 136-37.

### C. Procedural History

Presented with the above evidence supporting the parties' conflicting theories, the jury credited the Commonwealth's account and convicted appellant of first-degree murder and firearms not to be carried without a license.[7] On October 1, 2012, the trial court imposed an aggregate sentence of life imprisonment.

On direct appeal, appellant argued the inconsistencies inherent in the competing theories as to the shooter's identity rendered the verdict against the weight of the evidence. The trial court found otherwise, concluding in its Pa.R.A.P. 1925(a) opinion that, "while there are conflicts in the evidence, such discrepancies are not sufficient to render the jury verdict so contrary to the evidence as to shock one's sense of justice." Trial Ct. Op., 6/7/13, 6. The Superior Court agreed. In an unpublished decision, it

---

[7] 18 Pa.C.S. §2502(a) and 18 Pa.C.S. §6106(a)(1), respectively. The Commonwealth initially charged, but later *nolle prossed*, a count for persons not to possess a firearm, 18 Pa.C.S. §6105(a)(1).

affirmed appellant's judgment of sentence, and this Court denied further review. *Commonwealth v. Small*, 2021 MDA 2012 (Pa. Super., filed Oct. 9, 2013), *appeal denied*, 94 A.3d 1009 (Pa. 2014). Appellant did not seek a writ of *certiorari* in the United States Supreme Court.

On September 2, 2014, appellant filed a timely petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§9541-9546. The PCRA court[8] appointed counsel, who subsequently interviewed Tyson as part of his investigation. On March 12, 2015, Tyson executed the following notarized statement:

> I, Kenosha Tyson, withheld certain personal knowledge from the Harrisburg Police Department when questioned regarding the murder of William Price, Jr. Further, I continued to withhold that personal knowledge while testifying at [appellant]'s jury trial. Upon reflection, I believe I must make the proper authorities aware of what occurred immediately following the murder.
>
> Within hours of the murder, the father of my children, Pedro Espada, specifically admitted to me "I shot him" referring to Mr. Price, Jr.
>
> I was not forthright with this information because I feared any connection between me and the murder would have detrimentally affected Children and Youth proceedings regarding the custody of my children. Further, numerous threats were being made around my neighborhood immediately following the murder pertaining to anyone providing information to police.
>
> I am willing to testify to the above facts during any future court proceedings, including a new trial, should [appellant] receive that opportunity.
>
> I have neither been forced nor threatened in any way to make this statement. Further, no promises have been made to me to make this statement. I make this statement entirely of my own freewill.

Affidavit of Fact, Reproduced Record ("R.R.") at 270(a).

---

[8] The Honorable Scott A. Evans of the Court of Common Pleas of Dauphin County presided over both appellant's trial and his post-conviction proceedings.

Armed with Tyson's new affidavit, counsel filed an amended PCRA petition on March 23, 2015, alleging appellant was entitled to relief under 42 Pa.C.S. §9543(a)(2)(vi) (permitting relief where the petitioner proves by a preponderance of the evidence that the conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced").[9]

The PCRA court held an evidentiary hearing on May 12, 2015. At the hearing, Tyson testified that, within twenty-four hours of the murder, Espada called her and stated he was coming to her apartment. N.T. 5/12/15, 56. When Espada arrived, Tyson noticed he "was looking a hot mess. . . . He cut his hair and he just looked like he was up all night crying and stuff and he was like shaken up." Id.[10] She asked him what was wrong. Id. After stating he had "messed up[,]" Espada proceeded to tell Tyson he killed Price. Id. at 56-57. He told her he did it because of Price's prior assault on Tyson. Id. at 57-58. He also stated everybody was "in his ear the whole night talking about he should get him." Id. at 57.

According to Tyson, she did not tell police about Espada's confession when they interviewed her after the murder because her "two oldest kids were in foster care and

---

[9] The amended petition also presented a claim of ineffective assistance of trial counsel, which the PCRA court rejected. As appellant did not appeal that ruling, we do not discuss it further.

[10] We note Tyson's testimony regarding when she spoke to Espada was internally inconsistent. While she unequivocally stated in her affidavit that she saw Espada "[w]ithin hours of the murder," R.R. at 270(a), and she testified to that effect when prompted by defense counsel at the evidentiary hearing, her testimony seemingly differed on cross-examination. Notably, when the prosecutor asked Tyson if she had cut Espada's hair, she responded: "I didn't give him a haircut. When he came to my house the day he told me he shot [Price], **that was like a week later** when his hair was already cut." N.T. 5/12/15, 67 (emphasis added).

[she] was getting a lot of threats on Facebook." *Id.* at 59. She claimed: "[T]he police were threatening me that they would make sure my kids would stay in foster care and when I would have the baby I was pregnant with, they would take her and lock me up and make sure I lose my apartment, and stuff like that." *Id.*[11] As for her sudden willingness to come forward, Tyson explained she had "been praying a lot" and wanted to remove the stress she bore from withholding this information. *Id.* at 60.

On cross-examination, the prosecutor challenged Tyson with the signed statement she gave to police on March 15, 2011. In that statement, she told Detective Heffner she spoke with Espada at some point after Price was killed, but denied they talked about the murder. *Id.* at 63. Although Tyson admitted to signing the March 2011 statement, she claimed at the evidentiary hearing that she did so without reading it; she also claimed the Detective "wrote it very different from what [she] said." *Id.* at 63-64. When asked why she failed to report the threats made against her, she stated she did let police know about them, but asserted the "police were some of the people that were threatening [her,]" and they told her there was nothing they could do. *Id.* at 65, 68.

On January 19, 2016, the PCRA court granted a new trial based on appellant's after-discovered evidence claim. In an opinion accompanying its order, the PCRA court acknowledged that, to obtain relief, a petitioner raising a claim of after-discovered evidence must demonstrate the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

---

[11] We note this statement, too, is inconsistent with other evidence. Specifically, Tyson testified at trial that she had already given birth approximately two weeks before the murder. N.T. 8/7/12, 131-32.

PCRA Ct. Op. at 13, *citing Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008) (additional citations omitted). The court explained Tyson's testimony satisfied all four factors.

First, the court found it doubtful that Tyson's testimony could have been obtained prior to trial by the exercise of due diligence. *Id.* at 14. This was so, the court concluded, because Tyson's fear regarding the custody of her children and the threats made against her created an incentive to withhold the information. *Id.*

Turning to the second factor, the court acknowledged Tyson's testimony was "to some extent cumulative/corroborative, as other persons at trial testified that Mr. Espada was or could have been the shooter[.]" *Id.* at 15. Nevertheless, invoking "modification and common sense," the court concluded it was not merely corroborative or cumulative because the evidence linking appellant to the murder was largely circumstantial and Tyson's new testimony "goes to the very heart of the defense's theory" that Espada was the shooter. *Id.* In that vein, the PCRA court relied heavily on this Court's decision in *Commonwealth v. McCracken*, 659 A.2d 541, 545 (Pa. 1995) (upholding a grant of relief in the form of a new trial after concluding the recantation testimony of a central witness was "not merely cumulative or corroborative given the tenuous nature of the circumstantial evidence connecting [the defendant] to the crime").

For the same reasons that applied to the second factor, the court opined, Tyson's testimony would not be used solely to impeach the credibility of a witness. *Id.* Accordingly, with respect to the fourth and final factor — whether the evidence would likely result in a different verdict at a new trial — the PCRA court concluded:

> In light of the circumstantial evidence at trial, and not a shred of forensic evidence to support [appellant] as the shooter, a different outcome is probable. If credited by a jury, Ms. Tyson's statement and testimony regarding Mr. Espada's admission to her would likely result in a different verdict.

*Id.* at 16. The court came to this conclusion despite recognizing "the limitations inherent in recantation testimony, which has been characterized as 'extremely unreliable.'" *Id.* at 14, *quoting Commonwealth v. Williams*, 732 A.2d 1167, 1180 (Pa. 1999) (internal citation omitted). In this regard, the PCRA court explained Tyson's new testimony was more properly deemed a "recantation of silence," because it "did not contradict her prior statements or trial testimony," and thus it "cannot be considered recantation testimony in the traditional sense[.]" PCRA Ct. Op. at 14.

The Commonwealth appealed, claiming the PCRA court abused its discretion in finding Tyson's testimony credible and not merely corroborative or cumulative of the evidence presented at trial such that it warranted PCRA relief. The Superior Court agreed on both points and reversed the order granting a new trial.

Preliminarily, the Superior Court observed that the PCRA court misstated the record by declaring that Tyson "'did not contradict her prior statements or trial testimony.'" Superior Ct. Op. at 10, *citing* PCRA Ct. Op. at 14. Pointing to Tyson's March 15, 2011 statement to police, which the Commonwealth presented at the evidentiary hearing, the panel asserted the PCRA court was "technically incorrect" in re-characterizing Tyson's new statement as a "recantation of silence." Superior Ct. Op. at 11, *citing* N.T. 5/12/15, 62-63. The panel further held the PCRA court's determination that Tyson's testimony was not merely corroborative or cumulative was unsupported by the record. Superior Ct. Op. at 12. In addition to citing the PCRA court's concession that the new evidence was to some extent corroborative or cumulative, the panel noted the PCRA court failed to identify any other non-cumulative purpose that Tyson's testimony would serve. *Id.* at 12-13. Instead, according to the panel, the PCRA court relied only on the fact Tyson's testimony "goes to the very heart of the defense's theory at trial," a fact which the Superior

Court found "only serves to confirm that the testimony is cumulative, corroborative, and previously litigated." *Id.* at 13 n.14.

Next, the panel faulted the PCRA court for accepting Tyson's testimony "with no apparent corroboration." *Id.* at 15. After citing the requirements for the admissibility of a hearsay declaration against penal interest, *see* Pa.R.E. 804(b)(3), the panel stated it was "at a loss to discern what corroborating circumstances are supposed to indicate the trustworthiness of Ms. Tyson's latest statement." *Id.* at 14. The panel noted:

> [Tyson] denied reading the inconsistent statement she had signed in 2011. She blamed 'many people,' including family, friends, **and** the police for her reluctance to testify at trial about her now 'new' evidence. She claimed she had called the police about witness intimidation but was ignored. She testified she was **still** receiving threats, but didn't care what people were saying, and just chose to ignore it.

*Id.* at 14-15 (emphasis in original) (internal citations omitted). In the panel's view, not only did the PCRA court fail to consider these circumstances but, "[i]n fact, the court did not even make an assessment of [Tyson's] credibility[.]" *Id.* at 15.

Finally, the Superior Court panel stated the PCRA court's reliance on *McCracken* was misplaced. Instead, the panel found the more pertinent authority was its own decision in *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa. Super. 2010) ("Where the new evidence . . . supports claims the defendant previously made and litigated at trial, it is probably cumulative or corroborative of the evidence already presented."). Ultimately, the Superior Court concluded "Tyson's recantation testimony, identifying Espada as the shooter, was merely cumulative and corroborative of evidence previously presented at trial, in support of the acknowledged defense theme of the case." *Id.* at 17.

We granted allowance of appeal to consider the following issue: "Whether the Superior Court erred in reversing the PCRA court's grant of a new trial based on after-discovered evidence by finding that Tyson's testimony was merely cumulative and corroborative of the exculpatory evidence presented at [appellant]'s trial?"

*Commonwealth v. Small*, 172 A.3d 1117 (Pa. 2017) (*per curiam*). Our review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Cox*, 146 A.3d 221, 226 n.9 (Pa. 2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Burton*, 158 A.3d 618, 627 n.13 (Pa. 2017).

With these standards in mind, we consider the parties' arguments. Appellant acknowledges there was other evidence at trial that Espada committed the murder — including Espada's confessions to Dotson and Spriggs — but argues Espada's confession to Tyson is "different." Brief for Appellant at 17. Drawing language from cases interpreting cumulative evidence in the context of harmless error, appellant contends that, for after-discovered evidence to be "merely" cumulative, there must be "substantial similarity, in type of evidence and exculpatory factual details, between the after-discovered evidence and the evidence presented at trial of which it is cumulative." *Id.* at 24 (citation and internal brackets omitted). Appellant argues Espada's confession to Tyson "does not have substantial similarity in exculpatory factual details compared to the other two confessions" and, thus, it is not "merely" cumulative. *Id.* at 28. In response, the Commonwealth claims the new evidence is "wholly cumulative," casting Tyson as "simply another 'Dotson' alleging what Espada said after the murder." Brief for Appellee at 28. The Commonwealth also argues the circumstances surrounding Tyson's testimony rendered it incredible, and argues it would not have changed the outcome of the trial. *Id.* at 28-32. Our review of the parties' competing positions regarding Tyson's new statement necessarily occurs within the context of our jurisprudence on after-discovered evidence.

**II. Analysis**

## A.

The law on after-discovered evidence in Pennsylvania stretches back nearly two centuries. As early as 1819, in *Moore v. Philadelphia Bank*, 5 Serg. & Rawle 41, 42 (Pa. 1819), this Court proclaimed that, to be entitled to a new trial based on after-discovered evidence, the proponent of the new evidence must demonstrate: "1st, that the evidence has come to his knowledge since the trial; 2d, that it was not owing to want of due diligence, that it did not come sooner; and 3d, that it would probably produce a different verdict, if a new trial were granted." Over time, these core principles — albeit with some slight modifications and additions — became ingrained in Pennsylvania law.

By the mid-twentieth century, we recognized that, to justify the grant of a new trial on the basis of after-discovered evidence, "the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result[.]" *Commonwealth v. Schuck*, 164 A.2d 13, 17 (Pa. 1960), *cert. denied*, 368 U.S. 884 (1961). More recently, we have viewed this analysis in criminal cases as comprising four distinct requirements, each of which, if unproven by the petitioner, is fatal to the request for a new trial. As stated, this four-part test requires the petitioner to demonstrate the new evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. *Pagan*, 950 A.2d at 292. The test applies with full force to claims arising under Section 9543(a)(2)(vi) of the PCRA. *Burton*, 158 A.3d at 629. In addition, we have held the proposed new evidence must be producible and admissible. *Commonwealth v. Scott*, 470 A.2d 91, 95 (Pa. 1983).

Though the after-discovered evidence test is well settled, this Court has never defined precisely what constitutes "merely corroborative or cumulative evidence." We begin by noting there is a subtle difference between evidence that is "corroborative" and evidence that is "cumulative." In the most general sense, corroborative evidence is "[e]vidence that differs from but strengthens or confirms what other evidence shows," while cumulative evidence is "[a]dditional evidence that supports a fact established by the existing evidence." BLACK'S LAW DICTIONARY 674, 675 (10th ed. 2014). As discussed *infra*, however, whether evidence is labeled "corroborative" or "cumulative" is not critical to the after-discovered analysis; instead, what matters is whether the evidence **merely** corroborates or is cumulative of other evidence presented at trial. Thus, while much of the discussion below centers on cumulative evidence, the rule we ultimately announce for determining whether this prong of the after-discovered evidence test has been met applies equally to evidence that is corroborative, cumulative, or both.

Our most expansive pronouncement on the subject of merely corroborative or cumulative evidence appears in one of the earliest cases in which we applied the after-discovered evidence test to a criminal matter, *Commonwealth v. Flanagan*, 7 Watts & Serg. 415 (Pa. 1844). In *Flanagan*, the Court expounded on the law set forth two and a half decades earlier in *Moore*, articulating for the first time an additional requirement that after-discovered evidence — in order to support a request for relief — must be more than "merely" cumulative of other evidence presented at trial. *Id.* at 423. To that end, we stated: "So cumulative evidence, by which is meant additional evidence to support the same point, or where it is of the same character as evidence already produced, is not sufficient to induce the court to grant a new trial." *Id.* This definition of cumulative evidence was derived from *People ex rel. Oelricks v. Superior Court of City of New York*, 10 Wend. 285 (N.Y. 1833):

> [W]hat is cumulative testimony? The definition of the word *cumulative,* is 'that augments by addition, that is added to something else; in *law,* that augments as evidence, facts or arguments of the same kind.' *Webster's Dict'y.* It is derived from the [L]atin *cumulo,* to heap up, or *cumulus*, a heap. According to my understanding of cumulative evidence, it means additional evidence, to support the same point, and which is of the same character with evidence already produced.

*Id.* at 294 (emphasis in original). Aside from a passing remark in *Flanagan* regarding this "same point, same character" framework, this Court has done little more to explicate the meaning of the term.

Turning to other jurisdictions for guidance, it is apparent that, like New York, many states have adopted some version of the "same point, same character" analysis for determining whether newly discovered evidence is merely cumulative, and thus not sufficient to support a new trial. *See, e.g., State v. Bader*, 808 A.2d 12, 30 (N.H. 2002) ("Cumulative evidence is defined as additional evidence of the same kind to the same point.") (quotation and citation omitted); *Robinson v. State*, 64 P.3d 743, 756 (Wyo. 2003) ("Evidence is not cumulative if it is of a different character and of a separate and distinct fact.") (citation omitted); *State v. O'Donnell*, 433 S.E.2d 566, 570 (W. Va. 1993) ("[C]umulative evidence is evidence offered to prove what has already been established by other evidence. . . . [It] is additional evidence of the same kind to the same point.") (quotation and citations omitted). Our analysis of these concepts is enhanced by consideration of case law from the Supreme Court of Georgia:

> [T]he true test as to whether evidence is cumulative depends not only on whether it tends to establish the same fact, but it may depend on whether the new evidence is of the same or different grade. It is only when newly discovered evidence either relates to a particular material issue concerning which no witness has previously testified, or is of a higher and different grade from that previously had on the same material point, that it will ordinarily be taken outside the definition of cumulative evidence.

*Brown v. State*, 450 S.E.2d 821, 824 (Ga. 1994) (citation omitted).

We view the definitions of cumulative evidence employed by our sister states to be consistent with our decision in *Flanagan*, and we reaffirm that after-discovered evidence is merely corroborative or cumulative — and thus not sufficient to support the grant of a new trial — if it is of the same character and to the same material point as evidence already adduced at trial. It is clear the terms "of the same character" and "to the same point" refer to distinct qualities of evidence; to be "merely corroborative or cumulative," newly discovered evidence must tend to prove material facts that were already in evidence at trial, and also be of the same grade or character of evidence as that produced at the trial to prove those material facts. *See Brown*, 450 S.E.2d at 824. If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.

This definition of merely corroborative or cumulative evidence accounts for the reality that not all evidence relating to the same material point is equal in quality, or "grade." *See generally Commonwealth v. Dennis*, 950 A.2d 945, 963 n.14 (Pa. 2008) ("Where the defense is one of mistaken identity, and the only alibi witness [the defendant] presents is his father, it seems plain that the addition of an unrelated alibi witness whose testimony corroborates other testimony tending to exculpate [the defendant] is not 'merely cumulative[.]'"); *McCracken*, 659 A.2d at 545 (concluding recantation testimony was "not merely cumulative or corroborative given the tenuous nature of the circumstantial evidence connecting [the defendant] to the crime[.]"). It also fits squarely in line with those decisions where we have applied the after-discovered evidence test and determined the proposed new evidence was not merely corroborative or cumulative.

In *Commonwealth v. Cooney*, 282 A.2d 29 (Pa. 1971), for example, we concluded the PCRA court abused its discretion in denying the petitioner's motion for a new trial on the basis of after-discovered evidence — namely, evidence of a bullet lodged in the petitioner's head that was not discovered until after trial. The new evidence was relevant to the petitioner's defense against murder charges, in that he had argued at trial that he suffered a gunshot wound to the head while attempting to take the gun away from the victim; it was during this struggle, he alleged, that the gun went off accidentally and killed the victim. *Id.* at 30. Despite trial testimony from the Commonwealth's medical expert confirming the petitioner suffered a wound to his head that was consistent with a gunshot, this Court concluded the later, conclusive discovery of a bullet in the petitioner's head warranted a new trial. *Id.* Although we recognized the existence of the bullet "serve[d] to support and confirm the testimony" of the petitioner and the medical expert, we nevertheless held the strength of the new evidence, which "eliminate[d] all . . . other possibilities as the causative factor of the head wound," made the petitioner's theory of the crime "much more believable." *Id.* at 31. In other words, the discovery of the bullet in petitioner's head was of a "higher grade" than the other evidence which suggested petitioner had been shot, and therefore it did not "serve[ ] merely to corroborate the trial testimony," as the PCRA court concluded. *Id.* at 30. Consequently, we reversed the order denying the petitioner's motion for a new trial.

The result in *Commonwealth v. Valderrama*, 388 A.2d 1042 (Pa. 1978), was similar. The defendant in that case, facing murder and related charges, presented an alibi defense at trial, contending he was in Puerto Rico at the time of the crimes. *Id.* at 1044. To prove it, he presented multiple witnesses to establish his presence there, as well as municipal records establishing his employment by the town government. *Id.* In rebuttal, the Commonwealth presented Social Security Administration records

demonstrating the defendant had not earned any wages during the time the crimes occurred. *Id.* Following his conviction, the defendant obtained new evidence from the Puerto Rican government showing his wages had been reported without a social security number and, thus, were held in suspense by the Social Security Administration until a number could be obtained and the wages credited to his account. *Id.* at 1044-45. The trial court denied post-verdict relief, and this Court reversed, concluding, *inter alia*, that the new evidence was not merely corroborative or cumulative, and instead supported the grant of a new trial. We explained the new evidence was "significant beyond corroboration of [the defendant]'s alibi defense as it may negate the Commonwealth's evidence on the missing social security numbers." *Id.* at 1045.

Finally, in *Commonwealth v. Bulted,* 279 A.2d 158 (Pa. 1971), the prosecution argued to the jury that the defense had failed to produce a "phantom" witness with whom the victim — the defendant's wife — was allegedly having an affair before her death. *Id.* at 160-61. After a jury convicted the defendant of first-degree murder, it was discovered that the "phantom" witness was in fact a real person, Francisco Matos, and that he had fled the city after the victim's death. *Id.* at 161. In a subsequent deposition taken jointly by the prosecution and defense, Matos corroborated the defendant's trial testimony insofar as he admitted having an intimate relationship with the victim and engaging in a physical confrontation with the defendant over this relationship shortly before the victim's death. *Id.* On appeal, this Court reversed the trial court's order denying a motion for a new trial based on this evidence. In doing so, the Court rejected the Commonwealth's argument that Matos's testimony was "merely corroborative" of the defendant's testimony. *Id.* Instead, noting that the "emphasis which the district attorney placed on the supposed 'phantom' nature" of Matos was "indicative of the crucial importance . . . his supposed nonexistence played in the case[,]" this Court determined Matos's testimony may have

altered the jury's verdict with regard to the degree of homicide. *Id.* at 161-62. Under those circumstances, the Court concluded it "would be monstrously unjust to deny [the defendant] a second trial at which the jury will have an opportunity to weigh the testimony of Matos before reaching their verdict." *Id.* at 162.

Collectively, these cases confirm this Court has never foreclosed — and has actually embraced — the notion that new evidence tending to prove a material fact that was in evidence at trial is not always "merely" corroborative or cumulative, so long as it is of a higher and different grade or character. Moreover, our cases support a salutary goal of the after-discovered evidence rule: to limit continued litigation without being so rigid as to shut out newly discovered evidence from a credible source which may lead to a true and proper judgment. *See, e.g., Spencer v. State*, 153 S.W. 858, 860 (Tex. Crim. App. 1913) ("[T]he reason for the rule forbidding a new trial for the purpose of admitting cumulative testimony is that public policy . . . seeks to limit continued litigation, [but it] should never be applied where the newly discovered testimony may be of that cogency and force where it might probably show that an innocent man may probably be caused to suffer for a crime he did not commit."). Accordingly, we now clarify that evidence which is corroborative or cumulative, but not "merely" so — that is, the new evidence is of a higher grade or character than what was previously presented on a material issue — may properly be used to support the grant of a new trial.[12]

---

[12] This rule aligns with those imposed by other states, and is consistent with "a noticeable trend in the decisions in some jurisdictions which have applied the strict rule against [corroborative or] cumulative evidence to place a greater, if not complete, reliance upon the principle that the controlling factor is the probable result or effect of the new evidence upon another trial." T.C.W., *Newly Discovered Evidence, Corroborating Testimony Given Only By a Party or Other Interested Witness, as Ground for New Trial*, 158 A.L.R. 1253 (2011).

We recognize learned Pennsylvania jurists have similarly criticized the rote recitation and application of the four-pronged after-discovered evidence test as tending to supplant the

B.

We turn now to application of the after-discovered evidence test to the facts of this case. Appellant claims the Superior Court erred when it held Tyson's new affidavit and testimony was "merely" corroborative or cumulative of evidence presented at trial, such that it could not support the PCRA court's grant of a new trial based on after-discovered evidence. The Commonwealth does not contest that Tyson's new affidavit and testimony satisfied the first and third prongs of the after-discovered evidence test — respectively, whether the evidence could have been obtained prior to the conclusion of trial and whether it would be used solely to impeach the credibility of a witness. Instead, the Commonwealth claims Tyson's new evidence is merely corroborative or cumulative of other evidence presented at trial, and also that Tyson was simply not a credible witness who can provide evidence of a higher grade than other evidence on the identity of the shooter.

It is clear Tyson's new testimony — that Espada confessed to killing Price — tends to prove a material fact that was already in evidence at the trial. Deleon Dotson testified

---

critical inquiry in determining if a new trial is warranted — *i.e.*, whether the new evidence is of such probative value that it would have likely changed the outcome of the trial if it had been introduced. *See, e.g., Commonwealth v. Perrin*, 59 A.3d 663, 669 (Pa. Super. 2013), *vacated* 103 A.3d 1224 (Pa. 2014) (Wecht, J., concurring) ("In practice, the third and fourth prescribed inquires tend to collapse into each other. The fourth question, regarding the likelihood of a different result, tends to dominate the entire inquiry. I will go one step further and suggest that the second factor, concerning whether the after-discovered evidence in question would be merely cumulative, similarly is subsumed by the question of prejudice."); *Commonwealth v. Choice*, 830 A.2d 1005, 1010 (Pa. Super. 2003) (Klein, J., dissenting) ("I believe that what we have called a four-prong test is really only a three[-]prong [ ] test. Prong # 3, the 'only for impeachment' prong, is just an extension of Prong # 4, that the new evidence would not affect the outcome. Normally, evidence that just would tend to impeach what a witness said would not change the outcome at a new trial."). The definition of "merely corroborative or cumulative" evidence we announce today favorably advances the inquiry into whether the evidence would likely result in a different verdict, which we view as the lodestar of the after-discovered evidence analysis.

Espada told him he "walked up beside [appellant], walked around his left side, and . . . just pointed the gun and shot" Price. N.T. 8/8/12, 134-35. Moreover, Detective Neal testified he interviewed Lisa Small, who stated she learned from Jasmine Spriggs that Espada told her "he didn't know what to do and he didn't mean to shoot [Price.]" *Id.* at 11. In light of this evidence, Tyson's assertion that Espada confessed to the murder is not new; the jury heard it all before from others.

Appellant does not dispute this point. *See* Brief for Appellant at 24 ("Here, the type of evidence is the same: a confession by Pedro Espada."). Instead, he contends that, notwithstanding the evidence of Espada's other confessions, "Tyson's testimony is different" because it "significantly supports the defense theory of the case, much more so than the evidence actually presented at trial." *Id.* at 17. With regard to Espada's confession to Dotson, appellant highlights that Dotson testified he did not actually believe Espada's confession. *Id.* at 25, *citing* N.T. 8/8/12, 136-37. Appellant also notes that confession lacked factual support, as the medical examiner testified Price died as a result of a contact gunshot wound, and Espada told Dotson he was three to five feet away when he shot Price. *Id.*, *citing* N.T. 8/8/12, 134-35. As for the confession testified to by Detective Neal, appellant submits it was "hearsay within hearsay" and, as such, "cannot hold much weight." *Id.* at 26.

In stark contrast to these confessions containing "very limited exculpatory value," appellant posits, Tyson's new testimony "holds significant weight" because she testified to details surrounding Espada's confession to her, including his physical and emotional states. *Id.* at 21, 26-27. Appellant also points out that Espada's confession to Tyson included his motive for shooting Price. *Id.* at 27. Appellant further argues this confession to Tyson was more believable because it was made to the mother of Espada's children.

*Id.* According to appellant, "[t]his confession, in its factual details, is extremely exculpatory[.]" *Id.* at 28.

We find facial appeal in appellant's argument. In many ways, it invokes the analysis we clarified above for determining whether new evidence is "merely" corroborative or cumulative. Through his assertions that Tyson's testimony is "more exculpatory" and "more detailed," appellant essentially argues Tyson's testimony recounting Espada's confession is of a higher and different grade than the confessions testified to by Dotson and Detective Neal. Further, by stressing that Tyson's relationship to Espada makes her testimony "more believable," appellant implies that Tyson herself is a witness of a higher and different quality than the other witnesses. Ordinarily, appellant's position would be compelling, but the nature of Tyson's testimony complicates the matter.

As the PCRA court appreciated, this Court has repeatedly "acknowledged the limitations inherent in recantation testimony, which has been characterized as 'extremely unreliable.'" PCRA Ct. Op. at 14, *citing Williams*, 732 A.2d at 1180 (internal citation omitted). In fact, we have remarked that "[t]here is no less reliable form of proof, especially where it involves an admission of perjury." *Commonwealth v. Mosteller*, 284 A.2d 786, 788 (Pa. 1971) (citations omitted). For that reason, we have emphasized that, when addressing an after-discovered evidence claim premised on recantation testimony, "the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole." *Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004). "Unless the [PCRA] court is satisfied that the recantation is true, it should deny a new trial." *Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997) (citations omitted).

With these well-established principles in mind, we find it necessary to answer two preliminary questions central to the after-discovered evidence analysis in this case. First,

do Tyson's affidavit and new testimony amount to a recantation? And, if so, then second, did the PCRA court believe that recantation to be true?

The answer to the first question is clear. Although Tyson's new statements did not directly conflict with her trial testimony — neither party asked Tyson at trial if she ever discussed the murder with Espada — it is undoubtedly a recantation of her March 15, 2011 statement to police. In that statement, which the Commonwealth introduced at the evidentiary hearing, Tyson stated: "I spoke to Pedro [Espada] but didn't talk about [the murder]." N.T. 5/12/15, 63. She directly contradicted this statement in her 2015 affidavit and testimony by asserting that, when she spoke with Espada just hours after the murder, he confessed to her he committed the crime. Moreover, in her 2015 affidavit, Tyson acknowledged she "withheld certain personal knowledge from the Harrisburg Police Department when questioned . . . [and] continued to withhold that personal knowledge while testifying at [appellant's] jury trial." Affidavit of Fact, R.R. 270(a). Appellant concedes Tyson's new testimony is a "very minor recantation," Brief for Appellant at 15, but his attempt to minimize it fails. *See* BLACK'S LAW DICTIONARY 1459 (10th ed. 2014) (defining "recant" as "[t]o withdraw or renounce (**prior statements or testimony**) formally or publicly") (emphasis added).

The second question — did the PCRA court believe Tyson's recantation — is not so easily answered. The PCRA court opined that, in light of Tyson's new testimony, "a different outcome is probable." PCRA Ct. Op. at 16. This remark, coupled with the PCRA court's decision to grant a new trial, might imply the PCRA court determined Tyson's new testimony about a different shooter was credible and true. However, the Superior Court observed the PCRA court "did not even make an assessment of [Tyson's] credibility[.]" Superior Ct. Op. at 15. In fact, the PCRA court stated: "**If credited by a jury**, Ms. Tyson's statement and testimony regarding Mr. Espada's admission to her would likely result in a

different verdict." PCRA Ct. Op. at 16 (emphasis added). Even appellant admits the PCRA court "did not state whether [it] found [Tyson] credible" and it "seem[s] as though the PCRA court passed the credibility determination onto the jury instead of making the requisite finding [it]self." Brief for Appellant at 22-23. Appellant further notes the Superior Court "could have remanded the case so that the trial court could provide [its] position on the credibility of the witness." *Id.* at 22.

Where appropriate, we have remanded matters involving after-discovered evidence claims and specifically directed the trial or PCRA court to make credibility determinations on recantation testimony. For example, in *Williams*, the PCRA court failed to make an independent determination as to the credibility of the recanting witness. This Court noted the PCRA court, as fact-finder, "is in a superior position to make the initial assessment of the importance of [the recantation] testimony to the outcome of the case," and remanded with a direction for the PCRA court to "render its own, independent findings of fact and conclusions of law concerning [the recanting person's] credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony." 732 A.2d at 1181. Similarly, in *D'Amato*, the PCRA court failed to mention, let alone pass upon, the credibility of the recantation testimony in its opinion. After holding the PCRA court had defaulted on its duty to assess the credibility of the recantation and its significance in light of the trial record, this Court remanded the matter for the limited purpose of allowing the PCRA court to make that determination. 856 A.2d at 825-26.

We conclude the same result is necessary here. Under the circumstances, we decline to assume the PCRA court found Tyson's testimony credible based on the simple fact that it granted relief, and the course charted in *Williams* and *D'Amato* — a remand

to the PCRA court for the relevant credibility determination — provides an alternative to such an assumption.[13]

### III. Conclusion

Accordingly, we vacate the Superior Court's order and remand to the PCRA court for limited further proceedings consistent with this opinion.[14]

Jurisdiction relinquished.

Chief Justice Saylor, and Justices Baer, Todd, Donohue, Wecht and Mundy join the opinion.

---

[13] We recognize that, in cases such as *Williams* and *D'Amato*, we specifically remanded so the lower court could make credibility determinations on the recantation testimony "with an eye to the relevant prejudice standard," *Commonwealth v. Johnson*, 966 A.2d 523, 541 (Pa. 2009), *i.e.*, with an eye to the fourth prong of the after-discovered evidence test. Nevertheless, we find such credibility determinations to be equally important to the second prong of the test where the proposed after-discovered evidence consists of recantation evidence that may be of a different grade or character than evidence presented at trial. If the court determines the recantation testimony is incredible or untrue, it necessarily cannot be of such a higher and different grade or character as to remove it from the category of "merely corroborative or cumulative" evidence.

[14] The Superior Court was ostensibly of the opinion that the PCRA court independently erred in awarding a new trial because Tyson's testimony concerning Espada's confession would not be admissible at a new trial. *See* Superior Ct. Op. at 14 (recognizing hearsay declarations against penal interest are inadmissible unless there are corroborating circumstances that clearly indicate the trustworthiness of the statement). There is no indication in the PCRA court's opinion that it considered, as part of its after-discovered evidence analysis, the requirement that "the proposed new evidence must be producible and admissible." *Commonwealth v. Smith*, 540 A.2d 246, 263 (Pa. 1988). In the absence of the necessary credibility determination, however, we decline at this juncture to conclude a new trial was improper on this ground. Obviously, it is incumbent upon the PCRA court to determine on remand whether Tyson's new testimony would be admissible at a new trial pursuant to Pa.R.E. 804(b)(3), or on some other basis.