J-S42014-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL P. KING | : | |
| | : | |
| Appellant | : | No. 1116 EDA 2018 |

Appeal from the PCRA Order March 28, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0014200-2009,
CP-51-CR-0014201-2009

BEFORE:   OTT, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 08, 2019**

Michael P. King appeals from the order entered March 28, 2018, in the

Philadelphia County Court of Common Pleas, dismissing as untimely filed his

second petition for collateral relief filed pursuant to the Post Conviction Relief

Act ("PCRA"), 42 Pa.C.S. §§ 9451-9546.  King seeks relief from the judgment

of sentence of an aggregate 23½ to 47 years' imprisonment imposed on July

13, 2010, after his jury conviction of aggravated assault and criminal

conspiracy[1] at Docket No. 14200-2009, and possession with intent to deliver

("PWID") marijuana and fleeing or attempting to elude police officer[2] at Docket

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 2702(a), and 903, respectively.

[2] **See** 35 P.S. § 780-113(a)(30), and 75 Pa.C.S. § 3733(a), respectively.

No. 14201-2009. On appeal, he argues the PCRA court abused its discretion when it denied: (1) his request for relief based upon the PCRA hearing testimony of a new eyewitness to the crime; and (2) his motion for DNA testing of a ski mask recovered from the scene of the crime. For the reasons below, we affirm.

The relevant facts underlying King's conviction were summarized by the PCRA court as follows:

> On July 24, 2009, Eric Jones was working as a plumber in the Raymond Rosen Manor Homes, a Philadelphia Housing Authority development located on the 2000 block of North Judson Street. At approximately 1:30 p.m., Mr. Jones went outside to look for a part so that he could complete his assignment inside one of the houses on that block. When he came outside, he noticed a red truck in the middle of the street. Mr. Jones walked behind the truck, stepped into the middle of the street with his back facing the truck, and asked another Housing Authority employee at the corner of Judson and Diamond Streets whether a garbage disposal unit was available from the maintenance office. Hearing two gunshots very close to him, Mr. Jones turned and saw an arm extended outside the passenger window of the red truck. The passenger pointed and fired a semi-automatic handgun at Gregory Smith, who was approximately ten to twelve feet away from the passenger's right side.

> As the shooter fired an additional five to six times, Mr. Jones saw smoke coming out of the gun. Having been shot in the chest a couple of times, Mr. Smith spun around and fell to the ground. Still, the passenger continued to fire his gun. When the shooting stopped, the truck drove the wrong direction on the one-way street. Mr. Jones ran down the street to find Housing Authority police. When he returned to the scene, Philadelphia police officers had already arrived.

> Police Officers Dominic Mathis, Kevin Overton, Kenneth Emmett, and Joseph Caruso were on summer beat patrol in this high crime area. As they stood on the southeast corner of Judson and Norris Streets, they also heard several gunshots coming from one block

- 2 -

away. Hearing those gunshots, Officers Overton, Emmett, and Caruso ran north on Judson Street. As they headed in that direction, they saw a bright red Ford pickup truck with tinted windows speed past them, going south on Judson Street. Looking through the truck's front windshield, Officers Mathis and Caruso saw two black men inside the truck and noticed that the front passenger was larger than the driver. The passenger weighed approximately 200 to 250 pounds. The truck then turned right and headed westbound on Norris Street.

When Officers Overton, Emmett, and Caruso arrived at the shooting scene, they encountered a frantic crowd of people who were yelling, screaming or running into their homes or onto their porches. They found Mr. Smith lying on the sidewalk in front of 2056 North Judson Street. He was bleeding profusely as a result of being shot several times. Officer Overton and an unidentified woman applied pressure to Mr. Smith's gunshot wounds in an effort to stop the bleeding. As the other officers tried to control the crowd, several people started yelling, "Get the red truck. Get the red truck. Get the guys in the red truck." Officer Overton placed this information about a red truck over police radio. … [Mr. Smith was later] admitted to Temple University Hospital, where he was treated for nine gunshot wounds to his back and flank and underwent surgery to repair his liver. He was discharged on July 30, 2009. After Mr. Smith was taken to the hospital, Officers Overton, Emmett, and Caruso secured the crime scene and found fired cartridge casings in that area. They also attempted to find eyewitnesses, but no one was willing to cooperate.

While Officers Overton, Emmett, and Caruso tended to the gunshot victim, controlled the crowd, and preserved the crime scene, Officer Mathis ran after the red truck, which was travelling westbound on Norris Street toward 25th Street. When Officer Mathis lost sight of the truck at 25th and Norris Streets, he alerted other officers of a red Ford truck with license plate YYD2101 and asked police travelling in that area to stop the truck. Officer Shanna Moore was travelling in the area of 29th and Diamond Streets when she heard Officer Mathis' description of the truck over police radio. Minutes later, she saw a red truck matching this description on the 2500 block of Page Street, a small street between Norris and Diamond Streets, and signaled for the truck to stop. It did not stop, and Officer Moore gave chase. During this pursuit, the truck disregarded stop signs and traffic signals and drove in the wrong direction on many one-way streets. The truck slowed down on the 1600 block of Natrona Street, where

Officer Moore observed the passenger exiting the vehicle. Officer Moore informed other officers of the passenger's exit over police radio and described the passenger as a "black male, light-complected, approximately 6'3", 300 pounds, [wearing] tan pants, white shirt." She could not tell which direction the passenger fled because he was still standing on the street when she continued to follow the truck. As she continued to pursue the truck, Officer Moore continued to inform the other responding officers of her location and progress over police radio. The truck essentially drove in a circle and returned to the 1700 block of Natrona Street, about one block from where the passenger exited the truck. When the truck stopped, the driver exited on the 1700 block of Natrona Street. The truck crashed into a parked vehicle and was later held by other responding officers for investigation.

Officer Moore parked her vehicle and pursued the driver on foot. Officer Moore lost sight of the driver when he ran into a breezeway near the 3200 block of Clifford Street. Officer Moore informed other officers over police radio that the driver exited the vehicle and described him as a "dark male, [wearing] dark colored clothing." She also alerted officers that the truck had stopped on the 1700 block of Natrona Street and that the driver was running eastbound on the 3200 block of Eyre Street. Officer Moore then returned to the 1700 block of Natrona Street to confirm that no one on that block had been injured.

Officers Forbes and Ricci responded to Officer Moore's radio call and arrived at the 3200 block of Eyre Street, where they observed a man who matched Officer Moore's description running through a breezeway between Eyre and Clifford Streets. Officers Forbes and Ricci ordered the man to the ground. They arrested the man, later identified as defendant Michael King in the middle of the 3200 block of Clifford Street. Because they found no weapon on his person, they retraced defendant King's steps, but were unable to recover a weapon. Within minutes, Officers Forbes and Ricci met Officer Moore, who then identified King as the driver. Defendant King was transported to Central Detectives Division for processing.

[The passenger, and King's co-defendant, Jamar Stamps, was eventually found hiding in a home on the 3200 block of Turner Street. No gun was recovered from him. A ballistics expert testified at trial that the nine cartridge casings recovered from the scene were fired from the same .9mm gun. Four bullet fragments recovered were from a different firearm. An inspection of the red

truck reveal no bullet holes. King's thumbprint was identified on the interior passenger door of the truck.]

* * * *

In the bed of the pickup truck, [the assigned investigator, Detective Ralph Domenic,] recovered two Ziploc bags containing less than two pounds of marijuana. At trial Police Officer George Burgess, a narcotics officer qualified as an expert, opined that the marijuana was possessed with the intent to deliver, and that it had a total street value of more than $9,000 if sold in small quantities. Inside the truck, Detective Domenic recovered documents addressed to defendant King. Those documents included a rental agreement, a letter from a credit card company, and a letter from the Internal Revenue Service. Detective Domenic also recovered two photographs from the truck, one of which was printed on July 22, 2009 and depicted the victim, Gregory Smith, with his two brothers, Terrence Smith and Augustine Woodlong[,] at someone's graduation in summer 2006. For about three or four years, Gregory and Terrence were seen numerous times with defendant King during high school basketball games. Their brother Augustine played basketball and graduated from Simon Gratz High School one year after defendant King. … Two fingerprints on the back right side of the photograph were identified as defendant King's left index finger and left thumb. One fingerprint toward the back center of the photograph was identified as defendant King's left thumb. …

Detective Domenic discovered that the truck was registered to April Griffin, who declined a formal police interview. Detective Domenic also made several attempts to interview Mr. Smith, the shooting victim, but was unsuccessful due to Mr. Smith's initial physical inability and later refusal to cooperate. The victim's brother, Terrence Smith, also declined to be interviewed by Detective Domenic during his hospital visit.

PCRA Court Opinion, 7/27/2018, at 2-7 (record citations omitted).

King was subsequently charged at Docket No. 14200-2009 with attempted homicide,[3] aggravated assault, conspiracy, and possession of an

---

[3] *See* 18 Pa.C.S. §§ 901(a)/2502.

instrument of crime[4] for his involvement in the shooting, and at Docket No. 14201-2009, with PWID and fleeing and eluding police for the chase after the shooting. The case proceeded to a jury trial. On May 4, 2009, the jury found King guilty of aggravated assault and conspiracy at Docket No. 14200-2009, and both offenses at Docket No. 14201-2009. The jury acquitted King of attempted homicide and possession of an instrument of crime.[5]

On July 13, 2010, the trial court imposed the following sentence: (1) at Docket No. 14200-2009, at term of 10 to 20 years' imprisonment for aggravated assault, and a consecutive term of 10-20 years' imprisonment for conspiracy; and (2) at Docket No. 14201-2009, a term of two and one-half to five years' imprisonment for PWID and a consecutive term of one to two years' imprisonment for fleeing police. The court directed the sentences at both dockets to run consecutively to each other, for an aggregate term of 23½ to 47 years' incarceration.

King filed a timely direct appeal challenging three purported evidentiary errors as well as the trial court's refusal to grant a mistrial following alleged prosecutorial misconduct. This Court affirmed the judgment of sentence on direct appeal, and the Pennsylvania Supreme Court denied King's petition for

---

[4] *See* 18 Pa.C.S. § 907.

[5] King was tried jointly with his co-defendant, Stamps. Stamps was convicted of, *inter alia*, attempted homicide and criminal conspiracy, and sentenced to serve an aggregate term of 40½ to 81 years' imprisonment. *See* *Commonwealth v. Stamps*, 47 A.3d 1244 (Pa. Super. 2012) (unpublished memorandum), *appeal denied*, 49 A.3d 443 (Pa. 2012).

allowance of appeal. *See Commonwealth v. King*, 47 A.3d 1235 (Pa. Super. 2012) (unpublished memorandum), *appeal denied*, 49 A.3d 442 (Pa. 2012).

On September 4, 2012, King filed a timely, *pro se* PCRA petition, raising various claims concerning the ineffective assistance of trial counsel. Counsel was appointed, and filed an amended petition on February 3, 2014. However, on July 7, 2014, King filed a petition seeking permission to proceed *pro se*. Following a *Grazier*[6] hearing, the trial court granted King permission to proceed *pro se*, and King subsequently filed two additional amended PCRA petitions. On February 13, 2015, the PCRA court issued notice of its intent to dismiss King's petition without first conducting an evidentiary hearing pursuant to Pa.R.Crim.P. 907. Although King filed a *pro se* objection on February 18, 2015, the court, nevertheless, dismissed King's petition on March 13, 2015. King filed a timely appeal to this Court.

While that appeal was pending, King filed the present PCRA petition, his second, on August 29, 2016, alleging after-discovered evidence, namely a new eyewitness to the shooting who claimed King was not involved. On October 5, 2016, a panel of this Court affirmed the denial of relief from his first PCRA petition. *See Commonwealth v. King*, 159 A.3d 34 (Pa. Super. 2016). Thereafter, on April 7, 2017, King inquired as to the status of his August 2016 petition. The PCRA court directed the Commonwealth to file a response to that petition, and, on October 13, 2017, the Commonwealth filed

---

[6] *See Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998).

- 7 -

a motion to dismiss. Counsel was appointed for King, and filed a response to the motion to dismiss on December 7, 2017. Subsequently, on January 12, 2018, counsel filed a motion for discovery, seeking production of a "black mask" that was recovered from the crime scene, and DNA testing on that mask. Motion for Discovery, 1/12/2018, at ¶ 33. The court denied the motion on January 26, 2018. King then filed a second motion for discovery, seeking a list of rogue police officers who were the subject of an online news article published on February 13, 2018, in order to determine if any of those officers were involved in King's case. The case proceeded to a bifurcated PCRA hearing that began on March 9, 2018, and was scheduled to continue on March 28, 2018. In the meantime, on March 16, 2018, King filed another motion seeking DNA testing of the black mask recovered from the crime scene pursuant to 42 Pa.C.S. § 9543.1, in order to corroborate his after-discovered evidence claim. After the conclusion of the evidentiary hearing on March 28, 2018, the PCRA court entered an order dismissing King's second PCRA petition, and denying his request for DNA testing. This timely appeal followed.[7]

_____

[7] On April 12, 2018, the PCRA court ordered King to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). King complied with the court's directive, and filed a concise statement on April 17, 2018.

We note King filed a single notice of appeal from the order in question, despite the fact that the order disposed of two separate cases (Docket Nos. 14200-2009 and 14201-2009 ). This was common practice before June 1, 2018, when the Pennsylvania Supreme Court decided *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018). In *Walker*, the Court held that "when a single order

- 8 -

In his first issue on appeal, King contends the PCRA court abused its discretion when it denied his request for a new trial based upon the after-discovered evidence. "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Mitchell*, 141 A.3d 1277, 1283-1284 (Pa. 2016) (internal punctuation and citation omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." *Commonwealth v. Small*, 189 A.3d 961, 971 (Pa. 2018)

Before we may address the merits of King's underlying claim, we must first determine if the petition was timely filed.[8] The requirement that a PCRA petition must be filed within one year of the date the underlying judgment becomes final "is mandatory and jurisdictional in nature." *Commonwealth v. Taylor*, 67 A.3d 1245, 1248 (Pa. 2013), *cert. denied*, 134 S.Ct. 2695 (U.S. 2014). *See also* 42 Pa.C.S. § 9545(b)(1). "The court cannot ignore a petition's untimeliness and reach the merits of the petition." *Id.* Here, King's

---

resolves issues arising on more than one lower court docket, separate notices of appeal must be filed[, and t]he failure to do so will result in quashal of the appeal. *Id.* at 977. However, the Court held the decision would be applied prospectively only. *See id.* Because the notice of appeal herein was filed before *Walker*, we need not quash King's appeal.

[8] We note while the PCRA court addressed the timeliness of King's petition in its opinion, it did not specifically determine whether the petition met the timeliness exception set forth at 42 Pa.C.S. § 9545(b)(2)(ii). *See* PCRA Court Opinion, 7/27/2018, at 9. Rather, the court simply concluded the underlying claim was meritless. *See id.* at 11.

judgment of sentence was final on November 6, 2012, 90 days after the Pennsylvania Supreme Court denied his petition for allowance of appeal, and King failed to file a petition for writ of *certiorari* in the United States Supreme Court. **See** 42 Pa.C.S. § 9545(b)(3); U.S. Sup.Ct.R. 13. Therefore, King had until November 6, 2013, to file a timely PCRA petition. The one before us, filed almost three years later, is patently untimely.

Nevertheless, an untimely PCRA petition may still be considered if one of the three time-for-filing exceptions applies. **See** 42 Pa.C.S. § 9545(b)(1)(i)-(iii). A PCRA petition alleging any of the exceptions under Section 9545(b)(1) must be filed within 60 days of when the PCRA claim could have first been brought.[9] **See** 42 Pa.C.S. § 9545(b)(2).

Upon our review, we find King has sufficiently invoked the newly discovered facts exception to the timing requirements set forth in Subsection 9545(b)(1)(ii). The Act provides an exception to the one-year filing requirement when the petitioner alleges and proves "the facts upon which the claim is predicated were unknown to the petitioners and could not have been ascertained by the exercise of due diligence[.]" 42 Pa.C.S. § 9454(b)(1)(ii). Accordingly, the timeliness exception at Subsection 9545(b)(1)(ii),

---

[9] The Legislature recently amended Subsection 9545(b)(2), which now grants a petitioner one year to invoke one of the timing exceptions. **See** Section 3 of Act 2018, Oct. 24, P.L. 894, No. 146. The amendment, however, applies only to claims arising on or after December 24, 2017. Therefore, it is inapplicable here.

has two components, which must be alleged and proved. Namely, the petitioner must establish that: 1) the facts upon which the claim was predicated were **unknown** and 2) could not have been ascertained by the exercise of **due diligence**. If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under this subsection.

***Commonwealth v. Brown***, 111 A.3d 171, 176–177 (Pa. Super. 2015) (quotation omitted and emphasis in original), *appeal denied*, 125 A.3d 1197 (Pa. 2015). The Section 9545 exception "does not require any merits analysis of an underlying after-discovered-evidence claim." ***Id.*** at 177 (footnote omitted).

Here, the facts upon which the claim was predicated, *i.e.*, Pope's assertion that he was an eyewitness to the crime and the crime was not committed by King, were unknown to King until July of 2016, and could not have been ascertained by the exercise of due diligence. Indeed, Pope was a previously unknown witness who did not know King at the time of the crime. ***See*** Petition for Post Conviction Relief Act, 8/29/2016, at Exhibit A, Affidavit of Kailif Pope, 8/9/2016. Furthermore, King filed the present PCRA petition less than 60 days after speaking with Pope about the shooting. ***See*** 42 Pa.C.S. § 9545(b)(2). Therefore, we conclude King's petition filed on August 29, 2016, successfully invoked the newly discovered facts exception to the PCRA's timing requirements, and we may proceed to consider his substantive claim on appeal.

As noted above, King's first issue challenges the PCRA court's refusal to grant him a new trial based upon after-discovered evidence, namely, exculpatory testimony from a new eyewitness to the crime, Kailif Pope. Our

analysis of an after-discovered evidence claim consists of a four-part test, which requires the defendant to demonstrate the new evidence:

(1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Small**, **supra**, 189 A.3d at 972. In determining whether introduction of the new evidence would likely result in a different verdict if a new trial was granted, the PCRA court "should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." **Commonwealth v. Padillas**, 997 A.2d 356, 365 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010).

At the evidentiary hearing, Pope testified that on July 24, 2009, just prior to the shooting, he was walking up Judson Street to meet a friend. **See** N.T., 3/9/2018, at 20-21. He saw a man wearing a ski mask walk between a red truck that was stopped in the street and a parked car, pull out a gun, and start shooting. **See id.** at 21. Pope claimed the shooter then took off the mask and dropped it on the ground. **See id.** He stated the man in the mask was a short, "light skin guy with dreads," who looked nothing like King. **Id.** After witnessing the shooting, Pope claimed he ran because he was only 16 years old at the time and he was "scared." **Id.** at 35. He also testified that he told one friend what he saw that day, but never told anyone else. **See id.** at 22. Pope explained he met King for the first time in April of 2016 when

- 12 -

they were cellmates in prison. *See id.* at 16-17. He stated that on July 24, 2016, King "seemed like he was stressed" and "wasn't acting like his normal self." *Id.* at 19. When Pope asked King what was wrong, King told him it was "the anniversary of the day he was convicted of a crime." *Id.* at 20. Pope then told King he witnessed the shooting. *See id.* He stated, "I would never forget seeing somebody get shot." *Id.*

King argues Pope's testimony satisfies the criteria for establishing the existence of after-discovered evidence, and the PCRA court abused its discretion when it declined to grant him a new trial. *See* King's Brief at 16-17. He emphasizes Pope's testimony (1) could not have been obtained prior to trial, (2) was not merely corroborative or cumulative, and (3) would not have been used solely to impeach another witness's credibility. *See id.* at 18. Rather, King asserts Pope's testimony "was completely different than the narrative of how this shooting occurred that the Commonwealth presented to the jury." *Id.* Moreover, he insists if Pope had testified at trial,

> it would have strengthened [] King's theory of there being an alternative explanation for the shooting that occurred and that this alternative explanation would have given the jury grounds for concluding that reasonable doubt existed. As a result, a not guilty verdict would have resulted.

*Id.* at 19.

The PCRA court concluded, however, that Pope's account of the shooting is "highly suspect, lacking in credibility, and not worthy of belief." N.T., 3/28/2018, at 80. At the conclusion of the hearing, the PCRA court detailed the basis for its ruling:

[Pope] would have this Court believe that he was on the scene and witnessed the shooting. Further, he stated that the shooter committed the actual crime while wearing a mask, a mask which he then immediately removed after the shooting in the presence of others and discarded same at the crime scene.

As aforementioned, that account is wholly lacking in believability. Thus, it would not likely result in a difference verdict if a new trial were granted. That is especially so when one examines the evidence presented at Mr. King's trial. Mr. King and his codefendant Mr. Stamps were arrested after fleeing the scene of the shooting in a red truck driven by petitioner.

A witness stated at trial that the arm of an African-American male extended from the passenger side of the red truck and fired multiple shots into the body of the victim in this case, Gregory Smith.

Unknown to the assailants, a group of police cadets in training were one block away, heard the shooting and some responded to the scene. Upon arrival, members of the crowd gathered there, yelled get the red truck, which was pursued.

During the pursuit, Mr. Stamps jumped out of the moving truck, but was eventually arrested in the immediate area. Mr. King continued but later he, too, abandoned the truck and was arrested a short distance therefrom.

Inside the truck driven by Mr. King was a photograph of the victim and paperwork in Petitioner Michael King's name. There was also a quantity of marijuana in the truck bed. …

… Clearly, the black mask is a red herring with no connection to this case.

*Id.* at 81-83. We find the court's credibility determination is supported by the record, and, therefore, binding on this Court. *See Small*, *supra*, 189 A.3d at 971. Pope's claim that the shooting was committed by a man in a black ski mask contradicts the evidence at trial that the shooting was committed by the passenger in the red truck. The evidence established that Jones witnessed the shooter extend his arm from the truck's passenger

- 14 -

window and fire multiple shots at Smith, the truck sped from the scene immediately after the shooting, and the gathering crowd told the police to "Get the red truck." PCRA Court Opinion, 7/27/2018, at 2-3. Furthermore, while a black knit ski mask was recovered at the scene, the assigned investigator, Detective Ralph Dominic, testified at the evidentiary hearing that he did not submit the ski mask for DNA testing because "[t]here was no evidence to connect that mask to the incident whatsoever." *Id.* at 46. Indeed, neither Eric Jones, nor any of neighbors, ever stated the shooter wore a mask over his face. *See id.* at 51-52. Therefore, Detective Dominic assumed the hat was simply debris left on the street. *See id.* at 54.

Accordingly, we agree with the PCRA court that Pope's unbelievable account of the shooting, which he revealed for the first time after he became King's cellmate, would not "likely result in a different verdict if a new trial were granted." *Small*, *supra*, 189 A.3d at 972. Thus, Pope's first issue fails.

Next, King contends the PCRA court abused its discretion when it denied his motion for DNA testing on the black ski mask. *See* King's Brief at 20. Again, we find he is entitled to no relief.

A criminal defendant may seek post-conviction DNA testing of specific evidence pursuant to 42 Pa.C.S. § 9543.1. While a motion for DNA testing is not subject to the PCRA's one-year time bar, the request must be made "in a timely manner." 42 Pa.C.S. § 9543.1(d)(iii); *Commonwealth v. Walsh*, 125 A.3d 1248, 1252 (Pa. Super. 2015). The statute first requires the applicant to specify the evidence to be tested, consent to provide his own DNA samples,

and assert his "actual innocence of the offense for which [he] was convicted[.]" 42 Pa.C.S. § 9543.1(c)(1)-(2). The applicant must then establish a *prima facie* case demonstrating that: (a) the identity of the perpetrator in the case was at issue, **and** (b) DNA testing of the evidence, "assuming exculpatory results, would establish … the applicant's actual innocence of the offense for which the applicant was convicted[.]" 42 Pa.C.S. § 9543.1(c)(3)(i)-(ii)(A) (emphasis supplied).

In the present case, King concedes DNA testing of the black ski mask recovered from the crime scene "may not have been enough to change the outcome of [his] trial[.]" King's Brief at 23. However, he insists "the additional testimony of post-conviction witness Kailif Pope changed all that." *Id.* King argues: "That said additional testimony made [King's] claim of actual innocence far more acceptable by a trier of fact and now called for the said 'black mask' to undergo DNA testing to determine if that hat was worn by co-defendant Jamar Stamps, or even the Defendant, [] King, or by someone else." *Id.*

The PCRA court, however, concluded King failed to show "how any DNA findings would have led to a different outcome at trial." PCRA Court Opinion, 7/27/2018, at 13. We agree. First, as the PCRA court points out, King's "entire case is based upon the discredited testimony of Kailif Pope." *Id.* Pope provided the only testimony connecting the ski mask to the crime, and the PCRA court found his testimony to be incredible. Moreover, even if Pope's testimony was believed, and the shooter did wear a ski mask, the

- 16 -

Commonwealth never asserted that King was the actual shooter. Rather, he was tried as the shooter's co-conspirator/accomplice. Therefore, even if the DNA test revealed none of King's DNA on the ski mask, it would not establish his actual innocence of the crime. *See Commonwealth v. Smith*, 889 A.2d 582, 585 (Pa. Super. 2005) (affirming PCRA court's denial of defendant's request to conduct DNA testing of victim's fingernail clippings; no evidence at trial that victim scratched her attacker so that "[m]erely detecting DNA from another individual on the victim's fingernails, in the absence of any evidence as to how and when that DNA was deposited, would not exculpate appellant by pointing to a different assailant."), *appeal denied*, 905 A.2d 500 (Pa. 2006).

Indeed, even if DNA recovered from the ski mask matched neither King nor Stamps, there was no evidence presented at trial that the shooter wore a ski mask, let alone took it off and dropped it on the ground immediately after the shooting. Rather, as noted above, Jones testified the shooter was the passenger in the red truck, the crowd at the scene told the responding officers to follow the truck, the truck sped from the crime scene immediately after the shooting, King was stopped after abandoning the truck, and a picture of the victim and mail addressed to King were recovered from the truck. *See* PCRA Court Opinion, 7/27/2018, at 2-7. There is no indication the ski mask had any connection to the crime, save for Pope's discredited testimony. Accordingly, no relief is warranted.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/19