J-S38032-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
              v.   :
  :
  :
  :
MICHAEL ALAN WILKINS   :
  :
        Appellant   :   No. 432 MDA 2020

Appeal from the PCRA Order Entered January 8, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003315-2013

BEFORE:   KUNSELMAN, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:         **FILED SEPTEMBER 22, 2020**

Appellant, Michael Alan Wilkins, appeals from the January 8, 2020, order entered in the Court of Common Pleas of Berks County denying his first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, following an evidentiary hearing. After a careful review, we affirm.

The relevant facts and procedural history underlying this appeal have been set forth previously, in part, by this Court as follows:

> In the early morning of December 4, 2012, gunmen shot and killed Dario R. McLemore and Rafael Alequin in Reading. Three weeks later, the charred body of Jennifer Velez-Negron was found near a road in Lehigh County. A wad of cloth was taped into her mouth, and heroin and cocaine were found in her system.

---

[*] Former Justice specially assigned to the Superior Court.

The Commonwealth charged [Appellant] with the murder of all three victims. At trial, the Commonwealth presented the following evidence to supports its charges. Carlos Vargas-Osario testified that he lived with [Appellant] and [Appellant's] brother, Maurice. In the early morning of December 4, 2012, Vargas-Osario drove to Reading in his blue Camaro to find narcotics to purchase. While there, [Appellant] pulled alongside him in an SUV. Vargas-Osario noticed that both Maurice and [Appellant's] girlfriend, Velez-Negron, were in [Appellant's] SUV.

[Appellant] instructed Vargas-Osario to follow him. Vargas-Osario proceeded to follow the SUV in his Camaro. Shortly thereafter, he observed Maurice leave the SUV and discharge a firearm several times into a nearby vehicle. Maurice then got in the Camaro, and Vargas-Osario began to drive away. As he left the scene, he watched as someone fled the vehicle Maurice had shot at. He heard gunfire erupt from [the] driver's side of [Appellant's] SUV.

Reading Police Officer Tina Fallstich was on patrol at the time of the shooting and heard the shots from a nearby intersection. She proceeded to the location of the shooting and eventually discovered the body of Rafael Alequin slumped over in the passenger seat of a vehicle double parked in the road. As she was radioing in her observation, she noticed the body of Dario McLemore face down several feet away on the sidewalk.

The Commonwealth presented video from a nearby security camera. Investigator Eric Driesbach described the video as it played to the jury:

> The video…shows…three vehicles pulling up, stopping for what appears to be a red light, obviously, because they all stopped. A gentleman gets out of the passenger side of the second vehicle in line, walks over to the curb on the north side of the block right next to the first parked car, approaches the car, [and] appears to fire at least two gunshots at the car. The first car pulls through the intersection. The gentleman walks a little bit north on South Tenth Street. The other two vehicles go through the intersection and then the male returns to the third vehicle in line that was originally stopped in line.

While the video did not display the shooting of Dario McLemore, spent cartridges found near his body were of a

- 2 -

different caliber than those found in the area of the body of Rafeal [*sic*] Alequin.

Vargas-Osario testified that [Appellant] later admitted to the killing by explaining his motive. McLemore and Alequin had previously sold [Appellant] fake narcotics for $800. Furthermore, he testified that [Appellant] was angry with his girlfriend, Velez-Negron, as she had introduced [Appellant] to McLemore and Alequin.

Javonda Lebo testified that [Appellant] and his brother had confessed to the shootings later in the morning of December 4. [Appellant] expressed to her that Velez-Negron was at fault for the drug deal gone wrong, and that Velez-Negron "got to go, like for setting them up." Approximately two weeks later, [Appellant] and Maurice asked Lebo to create a mixture of cocaine and heroin in an effort to get Velez-Negron to overdose. When this attempt failed, [Appellant] and his brother [then] attempted to convince Velez-Negron to administer [a] fatal narcotic cocktail to Vargas-Osario.

After Velez-Negron's burnt body was discovered, Maurice showed Lebo a video of Velez-Negron taped to a chair. Maurice told Lebo that he and [Appellant] had given Velez-Negron three bags of heroin. [Appellant] was standing next to the chair, holding a clear plastic bag. Maurice asked Velez-Negron whether she would set anyone else up, and she shook her head. One of the men shoved a white cloth in Velez-Negron's mouth. [Appellant] placed the plastic bag over Velez-Negron's head as the men threatened her. After playing the video, [Appellant] admitted to Lebo that he had murdered Velez-Negron.

The jury found [Appellant] guilty of three counts of first degree murder, two counts of conspiracy to commit murder, one count of kidnapping, one count of criminal solicitation to commit [the] murder of Vargas-Osario, and several other lesser charges. After a penalty phase trial, on July 16, 2015, the jury reached a unanimous verdict of life imprisonment for the murder of Alequin. However, the jury could not reach a unanimous verdict for the murders of McLemore and Velez-Negron. As a result, the trial court imposed an aggregate sentence of three consecutive lifetimes.

*Commonwealth v. Wilkins*, No. 1401 MDA 2015, at 1-4 (Pa.Super. filed

8/26/2016) (unpublished memorandum).

Appellant filed a timely direct appeal on August 14, 2015, and on August 26, 2016, this Court affirmed Appellant's judgment of sentence.[1] Appellant filed a petition for allowance of appeal *nunc pro tunc*, which our Supreme Court denied on December 12, 2016.

Meanwhile, on October 21, 2015, while Appellant's direct appeal was pending before this Court, Appellant's brother, Maurice, who was also charged with murder as to McLemore, Alequin, and Velez-Negron,[2] entered a negotiated guilty plea to three counts of first-degree murder.[3] During his guilty plea hearing, Maurice agreed that he was pleading guilty to three counts of murder, and Appellant was his accomplice in the murders. N.T., 10/21/15, Maurice's guilty plea/sentencing hearing, at 5.

However, during the sentencing hearing, which occurred immediately thereafter, Maurice suggested Carlos Vargas-Osario, as opposed to Appellant,

---

[1] On appeal, Appellant contended the trial court erred in failing to sever his trial for the charge of murder of Velez-Negron from the trial of the other two murder charges, the evidence was insufficient to establish he participated in the conspiracy to kill McLemore and Alequin, the trial court erred in failing to provide special interrogatories for the jury to answer during deliberations, the jury's verdict was against the weight of the evidence, and the trial court erred in admitting evidence that Appellant attempted to interfere with the testimony of potential witnesses. This Court found all of Appellant's issues to be either meritless or waived.

[2] Maurice did not testify at Appellant's trial.

[3] In exchange for Maurice's guilty plea, the Commonwealth agreed to seek three sentences of life in prison, to run concurrently, and withdrew its request for the death penalty, as well as other charges.

was his accomplice.  Specifically, in exercising his right to allocution, Maurice

stated the following (verbatim):

> There's something else I want to clarify, to put on the record to make everybody know exactly what happened, not just media. This is exactly what took place and what happened and who did what and who did do what:
>
> On December 3rd, me, Carlos Vargas,[4] Jen Velez[5] were all getting high together and Carlos wanted to buy more crack.  And we couldn't get in touch with my brother to get more.
>
> So Jenny called two victims, Dario and Rafael.  And we all went to meet them.  Money was exchanged and drugs was exchanged.  And after the deal, Carlos noticed the drugs was fake. And he lost it and told Jenny, Bitch, you better get my money back or he was—so Jenny calls and calls and calls.  And the two guys give her the run-around.
>
> And in the meantime, Carlos got in touch with my brother and told him to meet us to buy some drugs.  So we met my brother on Franklin.  And I was on the phone with Carlos.
>
> As I left the car to get the drugs for my brother, Carlos tells me he sees the two guys at the light ahead of us.  He tells me to hurry up.  As I hurry he says shoot at them.  So I shot at them. I shot three, four times, whatever, in the window as the car pulled off.  Carlos pulls up and tells me to hurry up and get in his car.
>
> As Carlos drives off, Carlos pulls out his gun and he shoots at the other guy. And after that Carlos drives back to his house. Now, at his house Carlos continues to get high, drunk and tough. He, he, he starts to talk to me telling me we need to get rid of the bitch true.  Excuse my language.  This is exactly how it went.  I want to put it out there for comfort and closure.
>
> As he tells me we need to get rid of the bitch, he calls her up, lures her over to the house.  She comes in.  And as she comes in Carlos grabs her, puts the bag over her head, suffocates her. And as he is suffocating her he tells me tie her to the chair.  I tie her to the chair.  As she's tied to the chair and she is deceased.

---

[4] We recognize "Carlos Vargas" is "Carlos Vargas-Osario."

[5] We recognize "Jen Velez" is "Jennifer Velez-Negron."

At this moment I'm going a little haywire. I don't know what to do, nervous and everything.

Now, as, as Carlos tells me again we need to get rid of the body. I said I don't know what to do. We already messed up and did things we shouldn't had did. He says throw her in the truck, take her to another place, and dump her body. He, he drives over to Lehigh County, pulls her out of the car, sits on the side.

As I'm getting ready to get in, back in the car he says, no, wait a minute. He dumps gas on her, lights the match, and we take off. This is how things happened. And I just wanted to bring closure to that situation.

*Id.* at 12-14 (footnotes added).

Thereafter, on April 17, 2017, Appellant filed a timely *pro se* PCRA petition, and on April 25, 2017, Michael Dautrich, Esquire, was appointed to represent Appellant. However, Attorney Dautrich was permitted to withdraw, and on April 4, 2018, David Long, Esquire, was appointed to represent Appellant. On June 5, 2019, and August 7, 2019, Attorney Long filed amended PCRA petitions on behalf of Appellant. Appellant presented various claims in his initial and amended PCRA petitions, including that he was entitled to a new trial based on after-discovered evidence. Specifically, Appellant averred Maurice's statements, which he made in exercising his right to allocution at the October 21, 2015, sentencing hearing, indicating Carlos Vargas-Osario, and not Appellant, was Maurice's accomplice in the three murders, constituted after-discovered evidence.

On November 7, 2019, the PCRA court held an evidentiary hearing, at which Maurice acknowledged that he entered his guilty plea after the conclusion of Appellant's jury trial and sentencing. N.T., 11/7/19, PCRA

- 6 -

hearing, at 4. Relevantly, Maurice testified as follows upon examination by Appellant's PCRA counsel:

Q. Now, when you entered your guilty plea, you indicated that your brother was not aware of exactly what was going on, sir?

A. Yes, sir.

Q. And you took the blame for what had happened?

A. Yes, sir.

Q. And you said that [Appellant] wasn't aware of everything?

A. No, he wasn't.

Q. And what did you end up getting sentenced to?

A. Three life sentences; ran concurrent.

Q. And you say that your brother was just along for the ride?

A. I said that me and Carlos had met up with him to buy some drugs from him.

Q. But that he wasn't aware of what was going to happen?

A. No. Aside from the drugs, no.

*Id.* at 4-5.

On cross-examination by the Commonwealth, Maurice acknowledged that, during his guilty plea colloquy, he admitted Appellant was his accomplice; however, he testified at the PCRA hearing that he "didn't mean that." *Id.* at 8. Maurice testified he, thus, clarified Appellant's lack of participation during his sentencing hearing. *Id.*

Appellant's trial counsel testified he never considered having Maurice testify at Appellant's trial, and in fact, he did not question Maurice prior to trial. *Id.* at 16. Appellant's trial counsel noted Maurice was facing three

counts of murder, and he had the right to not incriminate himself. *Id.* at 16-18.

On January 8, 2020, the PCRA court entered an order denying Appellant's PCRA petition. On March 3, 2020, counsel filed on behalf of Appellant a notice of appeal. The PCRA court did not direct Appellant to file a Pa.R.A.P. 1925(b) statement, and consequently, no such statement was filed. On March 13, 2020, the trial court filed a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant sets forth the following sole issue in his "Statement of the Questions Involved" (verbatim):

A. Did the PCRA court improperly dismiss Defendant's request for a new trial under the Post Conviction Relief Act by refusing to accept as after-discovered evidence the testimony of his brother, Maurice Wilkins, that Defendant was not involved in the murder?

Appellant's Brief at 3 (suggested answer omitted).

As a prefatory matter, we must address the timeliness of this appeal.[6] Timeliness of an appeal concerns our appellate jurisdiction, which we may raise *sua sponte.* **Commonwealth v. Andre**, 17 A.3d 951, 957–58

---

[6] We note that, on May 4, 2020, this Court issued a rule to show cause as to why Appellant's appeal should not be quashed as untimely. On May 13, 2020, counsel filed a response on behalf of Appellant. Therein, counsel indicated he did not receive the PCRA court's January 8, 2020, denial order. Counsel noted he first learned of the order when he contacted the Clerk of Courts on March 3, 2020, to determine the status of the case. Upon learning of the January 8, 2020, order, counsel immediately filed a notice of appeal on March 3, 2020. Counsel claims that he has had issues with the Berks County Clerk of Courts failing to distribute orders in a timely manner. On June 17, 2020, this Court discharged the rule to show cause and referred the matter to this panel.

(Pa.Super. 2011). As stated above, the PCRA court entered an order denying Appellant's PCRA petition on January 8, 2020. Appellant, however, filed his counseled notice of appeal on March 3, 2020. Because Appellant's notice of appeal was due no later than February 7, 2020 (30 days after the PCRA petition was denied), this appeal appears to be untimely.

A notice of appeal must be "filed within 30 days after entry of the order from which the appeal is taken." Pa.R.A.P. 903(a). Our Rules of Criminal Procedure dictate that if, after an evidentiary hearing a judge denies a PCRA petition, the judge must "promptly issue an order denying relief" and that "order shall be filed and served as provided in Rule 114." Pa.R.Crim.P. 908(D)(1).

Rule 114 requires that all orders and court notices be docketed. Additionally, the Rule provides the docket entries shall contain the date the Clerk of Courts received the order, the date of the order, and the date on which the clerk served the order to the party's attorney or the party if unrepresented. *See* Pa.R.Crim.P. 114(B) and 114(C)(2).

As to the methods of service, the Rule provides, *inter alia*, that service may be effectuated in writing by mailing a copy to the party's attorney. Pa.R.Crim.P. 114(B)(3)(a)(iii). "The comment to this Rule suggests that the notice and recording procedures are mandatory and not modifiable." ***Commonwealth v. Davis***, 867 A.2d 585, 587 (Pa.Super. 2005) (*en banc*).

In the case *sub judice*, the record contains a proper docket entry of the PCRA court's denial order, as well as a copy of the order. As to the service of the order, the certified docket entry indicates: "Proof of Service 01/09/2020." A review of the "Proof of Service," which is included in the certified record, indicates the order was served upon "Defendant's attorney by mailing a certified copy thereof to: _____." The address portion was not completed by the Clerk of Courts. Accordingly, the certified record and docket entries do not reveal that proper service was effectuated upon Appellant, and due to this breakdown in the lower court, we shall not deem Appellant's appeal to be untimely.

Appellant challenges the denial of his petition filed pursuant to the PCRA. The following principles govern our review.

> We review an order [denying] a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error.
>
> This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa.Super. 2012) (internal citations omitted).

Appellant contends the PCRA court erred in denying his PCRA petition in which he presented a claim of after-discovered evidence. Namely, Appellant contends Maurice's statements, which he made in exercising his right to allocution at his October 21, 2015, sentencing hearing, indicating that Appellant did not participate in the three murders at issue, constitutes after-discovered evidence. Appellant contends Maurice was unavailable as a witness until after Maurice entered his guilty plea. Moreover, Appellant argues that, if the jury was made aware of Maurice's version of events, it would likely result in a different verdict if a new trial were granted.

Relevant here, the PCRA provides relief for a petitioner who demonstrates his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi). Accordingly, a petitioner seeking relief on the basis of after-discovered evidence must show that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Williams***, 215 A.3d 1019, 1024 (Pa.Super. 2019) (citation omitted). Because this test is conjunctive, a petitioner's failure to establish one prong by a preponderance of the evidence obviates the need to

examine the remaining ones.[7] ***Commonwealth v. Padillas***, 997 A.2d 356 (Pa.Super. 2010).

Moreover, credibility determinations are an integral part of determining whether a defendant has presented after-discovered evidence that would entitle him to a new trial. ***See Commonwealth v. Small***, 647 Pa. 423, 189 A.3d 961 (2018). We have stated, prior to granting a new trial based on after-discovered evidence, "a court must assess whether the alleged after-discovered evidence is of such a nature and character that it would likely compel a different verdict if a new trial is granted." ***Padillas***, 997 A.2d at

---

[7] We also note that Pa.R.Crim.P. 720(C), pertaining to after-discovered evidence, provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Moreover, the Comment to Rule 720 provides that, unlike ineffective assistance of counsel claims:

> [A]ny claim of after-discovered evidence must be raised promptly after its discovery. Accordingly, after-discovered evidence discovered during the post-sentence stage must be raised promptly with the trial judge at the post-sentence stage; after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge; and after-discovered evidence discovered after completion of the direct appeal process should be raised in the context of the PCRA.

Pa.R.Crim.P. 720, Comment.

Here, Appellant's claim of after-discovered evidence is premised upon statements Maurice made during his October 21, 2015, hearing, which occurred while Appellant's direct appeal was pending before this Court. On appeal, Appellant has neither explained when he discovered Maurice's statements nor provided any analysis as to whether he presented his after-discovered evidence claim "promptly" after its discovery. In any event, as discussed *infra*, we conclude Appellant is not entitled to relief on his claim.

- 12 -

365. "In making this determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Id.*

Here, assuming, *arguendo*, Appellant met the first, second, and third prongs of the after-discovered evidence test, we agree with the PCRA court that Appellant failed to meet his burden with regard to the fourth prong, *i.e.,* that his alleged after-discovered evidence would likely result in a different verdict if a new trial were granted.

For example, as it relates to the PCRA court's consideration of the integrity of the after-discovered evidence, as well as the motive of the person offering the evidence, the record reveals that Appellant's claim is premised on statements, which his brother, Maurice, made during his own sentencing hearing after Appellant's conviction by a jury. In examining Maurice's statements, we note Maurice initially acknowledged during his guilty plea colloquy that Appellant was his accomplice. N.T., 10/21/15, Maurice's guilty plea/sentencing hearing, at 5. However, when Maurice exercised his right to allocution during the sentencing portion of his hearing, Maurice indicated he wanted to "clarify" that Vargas-Osario was his accomplice in all three murders, and Appellant was merely present to sell drugs when McLemore and Alequin were shot. *Id.* at 12-14.

At Appellant's PCRA evidentiary hearing, Maurice contended that, when he initially acknowledged Appellant was his accomplice during his guilty plea colloquy, he "didn't mean that." N.T., 11/7/19, PCRA hearing, at 8. He explained that he accurately clarified during his sentencing hearing that Vargas-Osario was his accomplice, and Appellant was merely present selling drugs when McLemore and Alequin were shot. *Id.* at 4-5, 8.

We conclude the PCRA court was free to disbelieve Maurice's version of events indicating Vargas-Osario, as opposed to Appellant, was his accomplice, as well as reject Maurice's explanation as to why he made contrary statements during his guilty plea colloquy and sentencing hearing in this regard. *See Small*, *supra*.

Moreover, as it relates to the overall strength of the evidence supporting Appellant's three convictions for murder, the Commonwealth presented witnesses who testified Appellant admitted that he and Maurice killed McLemore and Alequin because of the "fake" drugs, and additionally, the Commonwealth presented witnesses who testified to Appellant's attempt to cover-up his involvement in the murders. Furthermore, the Commonwealth presented the testimony of a witness who indicated Appellant and Maurice asked her to create a mixture of drugs that would cause Velez-Negron to overdose. This same witness testified that she subsequently viewed a video of Appellant and Maurice as they put a white cloth in the mouth of Velez-Negron, as well as a clear plastic bag over her head, as she was taped to a

chair. Appellant admitted to this witness that he and Maurice killed Velez-Negron.

The PCRA court's consideration of the integrity of Maurice's statements implicating Vargas-Osario, as opposed to Appellant, as his accomplice, in combination with the PCRA court's consideration of the motive for the evidence, and the overwhelming evidence of Appellant's guilt, supports the conclusion that Appellant failed to demonstrate the alleged after-discovered evidence was of such a nature and character that it would likely compel a different verdict if a new trial was granted. *See Padillas*, *supra*. Thus, Appellant failed to meet the fourth prong of the after-discovered evidence test, and therefore, the PCRA court did not err in denying Appellant relief on this claim. *Id.*

For all of the foregoing reasons, we affirm.

Affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2020