J-A18021-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ISAIAH HEREFORD | : | |
| | : | |
| Appellant | : | No. 1162 WDA 2022 |

Appeal from the PCRA Order Entered September 8, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010538-2010

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED: February 9, 2024**

Isaiah Hereford appeals from the order, entered in the Court of Common Pleas of Allegheny County, denying his petition filed pursuant to the Post Conviction Relief Act (PCRA).  42 Pa.C.S.A. §§ 9541-46.  After careful review, we reverse and remand for a new trial.

On June 14, 2010, Brittany Poindexter attended the birthday party of her brother, Jahard, at Jahard's apartment in McKeesport's Crawford Village.[1] As the evening wore on, only five people remained at the party, Brittany, Jahard, Angela Sanders, Tre Madden, and Marcus Madden.  Shortly after 1:00 a.m., June 15, 2010, someone knocked on the screen door of the apartment's front door.  It was generally presumed that the person was there to buy a cigarette or marijuana, since Jahard and Marcus sold cigarettes and marijuana

---

[1] Crawford Village is a Section 8 public housing community located in McKeesport, Pittsburgh.  Jahard lived in apartment 24B.

out of the apartment. When Marcus approached the door, two armed men burst into the apartment. The two gunmen demanded money from the five people inside. Jahard attempted to retrieve the money but the gunmen opened fire on all five occupants. Jahard, Tre, and Angela died as a result. Brittany was uninjured and survived. Marcus was shot in the head, but ultimately survived the shooting. Both Brittany and Marcus testified at the subsequent jury trial.[2]

Brittany testified that she saw both gunmen but was unable to identify either. *See* N.T. Jury Trial (Day 1), 8/1/11, at 76. Brittany testified that the first gunman was holding a black handgun. *Id.* at 65. Brittany stated she knew the difference between a semi-automatic handgun and a revolver. *Id.* Birttany further stated that the handgun was a Smith and Wesson revolver, and she remembered that fact "[b]ecause the gun was in [her] face." *Id.* at 65-66; *see also id.* at 78 (Brittany testifying she was certain first gunman held revolver). Brittany testified that the second gunman was holding a black semi-automatic handgun. *Id.* at 67. Brittany stated that the second gunman yelled "Where's the cash[?]" *Id.* at 67, 79-81. Brittany further testified that the second gunman was wearing "two black shirts tied around his face." *Id.*

Marcus also testified that he knew the difference between a semi-automatic and a revolver. *See* N.T. Jury Trial (Day 3), 8/3/11, at 396.

_____

[2] Because it is relevant to Hereford's claims, we provide a detailed summary of both Brittany's and Marcus's testimony at trial.

However, in contrast to Brittany's testimony, Marcus testified that the first gunman had a semi-automatic handgun, and the second gunman held a revolver. *Id.* at 396-98. Marcus specified that the second gunman's weapon had a longer barrel and a cylinder. *Id.* Additionally, Marcus testified that the second gunman never spoke. *Id.* at 392.

Marcus testified that Hereford was the first gunman, and that Hereford did not have his face covered. *Id.* at 375, 398-99. He stated that the first gunman, who he estimated was 5'10," was taller than the second gunman. *Id.* at 389, 392, 398. Marcus was confident in his assessment, because Marcus, himself, is 5'10" and Marcus and the first gunman were standing "eye-to-eye" when Marcus first answered the door and saw the gunman. *Id.* However, at trial, Hereford's co-defendant, DeAnthony Kirk, stood side-by-side with Hereford and Marcus testified that Kirk was noticeably taller than Hereford.[3] *Id.* at 398-99. Additionally, Marcus testified that, prior to the shootings, he had been imbibing alcohol and was under the influence of marijuana. *Id.* at 370-71, 404.

---

[3] At trial, counsel failed to introduce Hereford's height into the record. However, we note that Hereford is either 5'5" or 5'6". *See* Affidavit of Probable Cause, 6/17/10, at 1 (listing Hereford's height as 5'5"); Warrant of Arrest, 6/17/10, at 2 (listing Hereford's height as 5'5"); *see also* PCRA Petition, 6/30/20, at 21 (listing Hereford's height as 5'6"). Moreover, we observe that the Pennsylvania Department of Corrections' Inmate Locator Tool confirms that Hereford is 5'6." *See* https://inmatelocator.cor.pa.gov, last updated 1/5/24 (last visited 1/5/24).

The day following the shooting, Kirk was arrested for his involvement in an unrelated burglary.[4]  On September 3, 2010, the Commonwealth charged Hereford with the instant offenses.

On August 1, 2011, Hereford and Kirk proceeded to a three-day jury trial, after which the jury convicted Hereford of three counts of second-degree murder,[5] two counts of aggravated assault,[6] and one count each of robbery,[7] burglary,[8] and conspiracy.[9]  On December 15, 2014, the trial court sentenced Hereford to three consecutive terms of fifteen years to life in prison.[10]

Hereford filed a timely appeal and this Court affirmed his judgment of sentence.  ***See Commonwealth v. Hereford***, 151 A.3d 1133 (Pa. Super.

_____

[4] There is no question that Kirk was one of the two gunmen, as he was arrested while in possession of one of the guns, a semi-automatic, used in the instant homicides.  Additionally, police later linked Kirk and this firearm to another unrelated shooting that occurred prior to the instant offenses.  During a search of Kirk's residence, police located Angela's stolen cellphone in the bushes outside of Kirk's apartment.  Furthermore, Kirk admitted to the killings.  ***See Commonwealth v. Kirk***, 83 A.3d 1056 (Pa. Super. 2013) (Table).

[5] 18 Pa.C.S.A. § 2502(b).

[6] ***Id.*** at § 2702(a)(1).

[7] ***Id.*** at § 3701(a)(1).

[8] ***Id.*** at § 3502(a)(1).

[9] ***Id.*** at § 903(a)(1).

[10] Initially, Hereford was sentenced to mandatory life imprisonment with no opportunity for parole.  However, Hereford was seventeen at the time of the offenses and, therefore, following the United States Supreme Court's decision in ***Miller v. Alabama***, 567 U.S 460 (2012), the trial court resentenced him as indicated above.

2016) (Table).  Hereford's only claim on direct appeal was that of after-discovered evidence in the form of a witness, Gina Simmons.  ***See id.***  In our memorandum disposing of that appeal, we summarized Simmons's proposed testimony as follows:

> Simmons, who is a neighbor of [Hereford]'s girlfriend and allegedly has no bias in this case, would testify that after she heard gunshots[,] she looked out of her window and saw two men running from the area of [the] crime and that [Hereford] was not one of the two men.  [] Simmons would testify that she saw [Hereford] on his girlfriend's porch approximately fifteen minutes after the incident.

***Id.***

Ultimately, this Court rejected Hereford's claim because:  (1) Hereford could have obtained testimony from Simmons previously with the exercise of reasonable diligence; (2) Simmons' testimony was merely cumulative of other evidence presented at trial; (3) Simmons' testimony was inadmissible as it merely impeached eyewitness Marcus' testimony; and (4) Simmons' testimony was unlikely to compel a different verdict if a new trial were granted.  ***Id.***  Hereford filed an application for allowance of appeal, which our Supreme Court denied.  ***Id.***, *appeal denied*, 158 A.3d 74 (Pa. 2016) (Table).

On September 22, 2017, Hereford filed a timely, counseled, PCRA petition, his first.  Hereford raised, *inter alia*, a claim that his trial counsel was ineffective for failing to call Simmons as a witness.  The trial court conducted a hearing, at which Simmons testified.  Subsequently, the PCRA court denied Hereford's petition.  Hereford timely appealed to this Court, and we affirmed.  ***See Commonwealth v. Hereford***, 215 A.3d 630 (Pa. Super. 2019) (Table).

Hereford filed an application for allowance of appeal, which our Supreme Court denied. *Id.*, *appeal denied*, 216 A.3d 1032 (Pa. 2019) (Table).

On June 30, 2020, Hereford filed the instant PCRA petition, his second.[11] In his petition, Hereford alleged that a newly-discovered witness, Quentin Ingram, came forward in February 2020 and would testify that Hereford was not involved in the shooting.[12] In support of his arguments, Hereford attached affidavits from his trial counsel and co-counsel (trial counsel) detailing their respective beliefs that they were ineffective in representing Hereford at trial. In particular, trial counsel state that their failure to introduce the height discrepancy between Marcus and Hereford, and speak with, or call, an expert regarding eye-witness identification resulted in the undermining of their defense strategy. *See* Affidavit of Anne Marie Mancuso, Esquire, Exhibit 7, at 1-2; Supplemental Affidavit of Richard J. Narvin, Esquire, Exhibit 6, at 1-2.

---

[11] We note that Hereford's jury trial and first PCRA petition took place before the Honorable Donna Jo McDaniel, who retired prior to Hereford filing his second PCRA petition. Hereford's case was reassigned to the Honorable Kevin J. Sasinoski (PCRA court), after Judge McDaniel's retirement.

[12] Prior to the filing of this PCRA petition, Hereford, on October 23, 2019, filed a counseled petition for habeas corpus relief in the United States District Court for the Western District of Pennsylvania. *See* Docket No. 19-cv-1377 (Magistrate Judge Maureen P. Kelly). In support of this filing, Hereford attached affidavits from his trial counsel, Richard J. Narvin, Esquire, and Anne Marie Mancuso, Esquire, acknowledging their respective ineffectiveness and their belief that Hereford is innocent and is subject to an unjust conviction. These affidavits were also filed in the instant docket before this Court, as noted *infra*. Due to the discovery of Ingram's testimony occurring after the filing of his habeas corpus petition, the federal habeas corpus petition has been stayed pending our resolution of Hereford's instant PCRA appeal.

Hereford requested a PCRA evidentiary hearing, and the Commonwealth filed an answer wherein it agreed that an evidentiary hearing was warranted.

On December 8, 2021, the PCRA court conducted an off-the-record status conference, at which the court informed the parties that it would not permit Hereford to present eyewitness identification expert testimony at the PCRA hearing. On December 17, 2021, Hereford filed a motion to reconsider, which the PCRA court denied. On February 17, 2022, the PCRA court conducted an evidentiary hearing, at which Ingram and private investigator Keri Bozich testified. After the hearing, both parties filed briefs. On March 18, 2022, the PCRA court found that Hereford's petition satisfied the newly-discovered facts exception to the PCRA's time bar, but denied Hereford's petition on the merits.

Hereford filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He now raises the following claim for our review: "The credible evidence offered at the evidentiary hearing showed that [] Hereford is entitled to PCRA relief on his after-discovered evidence claim. The PCRA court nevertheless denied relief. Did the court err?" Brief for Appellant, at 3.

Before addressing Hereford's issue on appeal, we must determine whether his PCRA petition was timely filed and, if not, whether he has satisfied an exception to the PCRA time bar. Any PCRA petition "shall be filed within a year of the date judgment becomes final." 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final "at the conclusion of direct review,

including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking review." *Id.* at 9545(b)(3). The PCRA's timeliness requirements are jurisdictional in nature, and a court may not address the merits of the issues raised if the PCRA petition was not timely filed. *Commonwealth v. Albrecht*, 994 A.2d 1091, 1093 (Pa. 2010).

Instantly, Hereford's judgment of sentence became final, for purposes of the PCRA, on December 26, 2016, when the time expired for him to file a writ of certiorari in the United States Supreme Court. *See* 42 Pa.C.S.A. § 9545(b)(1)-(3); Sup.Ct.R. 13. Consequently, Hereford's instant PCRA petition, filed on June 30, 2020, is patently untimely.

However, Pennsylvania courts may consider an untimely petition if the petitioner can explicitly plead and prove one of the three exceptions set forth at 42 Pa.C.S.A. §§ 9545(b)(1)(i)-(iii). Those three exceptions are as follows:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* Any petition invoking one of these exceptions "shall be filed within one year of the date the claim could have been presented." *Id.* at § 9545(b)(2).[13] "The PCRA petitioner bears the burden of proving the applicability of one of the exceptions." *Commonwealth v. Spotz*, 171 A.3d 675, 678 (Pa. 2017).

Here, Hereford invoked the newly-discovered facts exception.[14] Hereford argues that Ingram's testimony and existence were entirely unknown to him until February 2020, when Ingram sent his first letter to PCRA counsel. *See* Brief for Appellant, at 37. Hereford contends that he exercised due diligence, which is exhibited by his immediate filing for a stay of his federal

---

[13] We observe that section 9545(b)(2) was amended on October 24, 2018, effective in 60 days (*i.e.*, December 24, 2018), extending the time for filing from 60 days of the date the claim could have been first presented, to one year. The amendment applies to claims arising on December 24, 2017, or thereafter. *See* Act 2018, Oct. 24, P.L. 894, N. 146, § 3. Instantly, for the reasons discussed *infra*, the earliest Hereford could have presented this claim was on February 26, 2020. Consequently, he had one year from that date to file a PCRA petition raising his claim. Therefore, his PCRA petition filed on June 30, 2020, was filed within the one-year window. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii); *id.* at § 9545(b)(2).

[14] Throughout his PCRA filings, Hereford mistakenly claims he is invoking the "after-discovered" evidence exception to the PCRA time bar. As mentioned *supra*, a claim of newly-discovered facts is one of the exceptions to the PCRA's one year time bar, *see* 42 Pa.C.S.A. § 9545(b)(1)(ii), while an after-discovered evidence claim is a substantive claim for PCRA relief. *See* 42 Pa.C.S.A. § 9543(a)(2)(vi); *see also Commonwealth v. Burton*, 158 A.3d 618, 629 (Pa. 2017) (reiterating "the newly-discovered facts exception to the time limitations of the PCRA, as set forth in subsection 9545(b)(1)(ii), is distinct from the after-discovered evidence basis for relief delineated in 42 Pa.C.S.[A.] § 9543(a)(2)"). Nevertheless, this error does not impede our review because Hereford properly addresses each requisite factor under the **newly**-discovered facts exception to the PCRA time bar, before addressing the merits of his claim.

habeas corpus proceedings. *Id.* Further, Hereford contends that he could not have learned of Ingram's testimony prior to February 2020 because Ingram was absconding from the law due to his trespasser status in Crawford Village, and Ingram never spoke with police or Hereford's trial counsel about the case. *Id.* We agree.

The newly-discovered facts exception to the PCRA time bar "renders a petition timely when the petitioner establishes that the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Commonwealth v. Small*, 238 A.3d 1267, 1271 (Pa. 2020) (quotation omitted). A PCRA court must first determine "whether the facts upon which the claim is predicated were unknown to the petitioner." *Id.* at 1282 (quotation marks omitted). If the PCRA court concludes that the facts were unknown, then the PCRA court must next examine whether "the facts could have been ascertained by the exercise of due diligence, including an assessment of the petitioner's access to public records." *Id.* Further, "[d]ue diligence demands that the petitioner take reasonable steps to protect his own interests. A petitioner must explain why he could not have obtained the new facts earlier with the exercise of due diligence. This rule is strictly enforced." *Commonwealth v. Monaco*, 996 A.2d 1076, 1080 (Pa. Super. 2010).

Instantly, Hereford was unaware of Ingram's testimony, let alone his existence as a witness, until February 26, 2020.[15]  **See** PCRA Court Opinion, 12/15/22, at 6 (PCRA court expressly finding Hereford's claim timely based upon Ingram's testimony).  At the evidentiary hearing, Ingram testified that he did not reach out to Hereford or his counsel until February of 2020.  **See** N.T. PCRA Hearing, 2/17/22, at 27-29.  Further, Ingram testified that he had not told anyone what he saw on the night of June 14-15, 2010, until he contacted Hereford's PCRA counsel.  **Id.** at 27-29, 78-80.  Ingram stated that he was a known trespasser and drug dealer in Crawford Village, so he did not want to alert police to his presence there that evening.  **Id.** at 36-37, 41.  Additionally, Ingram testified that it was his belief that Hereford had been charged as an accomplice, not as one of the two shooters.  **Id.** at 43, 47-49, 61, 63-64.  Ingram became aware, in January of 2020, that Hereford was charged and convicted as one of the shooters and only then began attempting to reach out to Hereford's PCRA counsel.  **Id.** at 61, 63-65 (Ingram testifying he asked friends and family to find Hereford's attorney); **see id.** at 71-73, 78

---

[15] Ingram is serving a 76-to-152-year homicide sentence.  **See** N.T. PCRA Hearing, 2/17/22, at 43, 50-51, 73-74.  As it relates to timeliness, at the PCRA hearing, Hereford introduced evidence of Ingram's first letter to PCRA counsel. **See id.** at 27-29.  The date Ingram had written on the letter was illegible and was determined to either be February 26, 2020, or March 26, 2020.  **See id.** In any event, Hereford had one year from the earliest date he could have raised this claim.  Consequently, his June 30, 2020 PCRA petition raising this claim falls within one year of either date.

(Ingram testifying PCRA counsel sent Ingram a letter in late January 2020 requesting any information Ingram may have).[16]

Consequently, it is clear from the record that Hereford was not, and could not have been, aware of Ingram's eyewitness testimony. *See Small*, *supra*; *see also* PCRA Court Opinion, 12/15/22, at 6. Further, we observe that as soon as Hereford learned of Ingram's eyewitness account, he requested a stay of his federal proceedings, *see supra*, and filed the instant PCRA petition upon a grant of that stay. Accordingly, we conclude that he took reasonable steps to protect his interests, in accordance with our due diligence standards, and therefore, has satisfied the newly-discovered facts exception to the PCRA time bar. *See Monaco*, *supra*.

Once jurisdiction has been properly invoked by establishing one of the three exceptions to the PCRA's time bar, the relevant inquiry becomes whether the claim is cognizable under the PCRA. Section 9543, titled "Eligibility for relief," governs this inquiry. Among other requirements not pertinent to this appeal, section 9543 delineates seven classes of allegations that are eligible for relief under the PCRA. *See* 42 Pa.C.S.A. § 9543(a)(2). Of relevance here is the "after-discovered evidence" provision, which states that a claim alleging

---

[16] We note that PCRA counsel's letter to Ingram is dated earlier than Ingram's February 2020 letter. However, this does not impact our timeliness calculations because, at that time, neither PCRA counsel nor Hereford knew what information, if any, Ingram possessed. *See id.* at 61, 63-65, 71-73. Moreover, even if PCRA counsel's January 2020 letter is the appropriate date to begin our calculations from, which we do not find, Hereford's instant PCRA petition was still filed within one year from that date.

"the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced" is cognizable under the PCRA. 42 Pa.C.S.A. § 9543(a)(2)(vi). To establish such a claim, a petitioner:

> must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of due diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Commonwealth v. Medina**, 92 A.3d 1210, 1218 (Pa. Super. 2014).

Hereford argues that the Commonwealth's identification evidence presented at his jury trial consisted solely of Marcus's testimony, which was both internally inconsistent and contradicted by Brittany's trial testimony. **See** Brief for Appellant, at 36, 39-41. Hereford contends that the new eyewitness, Ingram, presented testimony at the PCRA hearing that confirms Hereford was not one of the two gunmen in the early morning of June 15, 2010. **See id.** at 36-37, 41-49. In support of his argument, Hereford asserts that Ingram's eyewitness account is not merely corroborative or cumulative, and that its sole purpose is not for impeachment. **See id.** at 52-55. Hereford points out that Ingram's testimony is corroborated in part by both Brittany's and Marcus's testimonies, yet Ingram's testimony offers new evidence. **See id.** In particular, Ingram testified regarding what the shooters were doing immediately prior to the homicides and that neither shooter was Hereford. **See id.** For the same reason, Hereford argues that Ingram's testimony is not solely used for the purpose of impeaching Marcus's testimony. **See id.**

- 13 -

Hereford claims that Ingram's testimony is "of a different grade and character . . . because it consists of a new eyewitness account from a person who saw the shooters immediately before they entered [a]partment 24B and started shooting." *Id.* at 53.

Hereford further asserts that the PCRA court erred in finding that Ingram was not credible. *See id.* at 41-49, 56-67. In support of this argument, Hereford contends that, in evaluating Ingram's credibility, the PCRA court failed to review the jury trial transcript, to balance Ingram's testimony against the evidence produced by the Commonwealth at trial, and to consider Ingram's demeanor during his testimony at the PCRA hearing. *See id.* Additionally, Hereford posits that the PCRA court failed to consider that Ingram had no ulterior motive in giving his testimony, other than Ingram's stated interest in telling the truth. *See id.* at 41-50. Hereford argues that the PCRA court's finding that Ingram was not credible is further unsupported by the record where there was no evidence presented to impeach Ingram's credibility, and Ingram's testimony was corroborated with the evidence presented at Hereford's jury trial. *See id.* at 45-51. We agree.

Our standard of review of an order denying PCRA relief is well-established:

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such

a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Mason***, 130 A.3d 601, 617 (Pa. 2015) (citations and quotation marks omitted).

At the PCRA hearing, Ingram testified that he was visiting his girlfriend in Crawford Village on the night of the murders. ***See*** N.T. PCRA Hearing, 2/17/22, at 8-10. Ingram testified that his girlfriend lived at apartment 29D. ***Id.*** at 9-10; ***see also id.*** at 12-13, Defense Exhibits A-1, A-2 (photographs depicting Ingram's girlfriend's apartment). Ingram stated that he is very familiar with Crawford Village and its layout because he grew up there and lived there his entire life. ***Id.*** at 10-11 (Ingram testifying his mother lived across street from Crawford Village, and Ingram has three siblings still living in McKeesport neighborhood). Ingram explained that Crawford Village is a series of rows of buildings designated by numbers, and each apartment in a row is designated by a letter "A" through "H." ***Id.*** at 12-17 (Ingram identifying each row of homes and explaining Crawford Village's general layout); ***id.*** at 15-16, 21 (Ingram shown present day photographs depicting Crawford Village and testifying housing complex has identical layout as it did in 2010).

Ingram testified that late on the evening of June 14, 2010, into the early morning hours of June 15, 2010, Ingram was on the porch of his girlfriend's apartment, "29D." ***Id.*** at 16-17. From his vantage point, Ingram saw two men near apartment 29A, one of whom was adjusting a firearm on his hip.

- 15 -

*Id.* at 17, 21-23. Ingram testified that the two men were taller than him, wearing dark clothing, had shirts tied around their faces, and were darker skinned than Ingram. *Id.* at 23. One of the men had two black shirts tied around his face, and the other man had only one shirt tied around his face. *Id.* Ingram testified that he is 5'5" and weighed 150 pounds, but at this distance he could easily tell both men weighed more than him and were taller than him. *Id.* at 23-24. Ingram clarified that the two men were closer to PCRA counsel's height, which was noted for the record as 5'11." *Id.* at 24. Ingram further testified that both men were taller than Hereford's height of 5'6." *Id.*

Ingram left the porch, followed the men, and again saw the two men while Ingram was on the staircase between buildings "28" and "29." *Id.* at 16, 18-19, 36; *id.* at 16-18, Defense Exhibit A-4 (depicting staircase between buildings 28 and 29). From this vantage point, Ingram saw the two men standing outside of 24B, Jahard's apartment. *Id.* at 18-19. Ingram testified that one of the men appeared to be "messing with a cell phone" and the other man "looked in the window of 24B." *Id.* at 19-20. Ingram stated he saw both men "bum rush" the door of apartment 24B. *Id.* at 19. Ingram said that almost immediately after the men entered 24B, he heard multiple gunshots from two different firearms. *Id.* at 37-38. Ingram testified that he ran back into his girlfriend's apartment as soon as he heard the gunshots. *Id.* at 38-39. Ingram testified that he saw police arrive shortly thereafter but did not speak with them. *Id.* at 39-40. After police cleared the scene, Ingram left

his girlfriend's apartment and walked to his mother's home, which was approximately five minutes away. *Id.* at 40-41.

Ingram testified that neither of the men he saw that night were Hereford. *Id.* at 8-9, 41-42. Ingram stated that he knew Hereford but was not close friends with him because Hereford was younger and "hung out with younger people." *Id.* at 41-42; *id.* at 65-67 (Ingram clarifying on cross-examination that he knew Hereford from the community, and Hereford's girlfriend lived in a house Ingram's mother previously owned). Ingram testified that he could not identify either of the two men; however, he was certain neither man was Hereford due to the height and weight discrepancies, as well as both shooters having darker skin tones than Hereford. *Id.* at 42, 47-49; *id.* at 79 (Ingram testifying on re-direct examination that it did not make sense for Hereford to be one of the shooters, because Ingram did not see Hereford there and the shooters had dark skin tones).

Preliminarily, we observe that the PCRA court, in its opinion, found Ingram to be not credible, and addressed Hereford's claim as follows:

> [Hereford] alleges the PCRA court erred by denying relief based on the after[-]discovered evidence. After the evidentiary hearing, the PCRA court found the defendant's witness was not credible. The hearing amounted to a slide show of photographs where the witness identified numerous residences in a housing community where the murders occurred. He did not observe the shooting. He admitted that the alleged shooters['] faces were covered. He opined that [Hereford] was not the same height as the person who forced his way into the victim's residence the night of the murder. The witness did not give a statement to police on the night of the shooting, supposedly because he was a trespasser in the public housing community, and a reputed drug dealer. The witness[,]

who is currently serving a life sentence for murder, finally came forward more than 10 years after allegedly making his observations. When the defense presented the alleged after[-]discovered evidence, Allegheny County Homicide Detective Patrick Kinavey attempted to interview the witness who refused[,] claiming he didn't know the detective. This is puzzling since Detective Kinavey is the same police officer who investigated and prosecuted the witness in his own homicide trial.

Under these circumstances the court did not find [Ingram] to be credible. Additionally, the court does not believe that the outcome of the trial would differ even with the proposed after[-]discovered evidence. This claim is without merit.

PCRA Court Opinion, 12/15/22, at 6-7.

Based upon our review of the record, we conclude that the PCRA's finding that Ingram is not credible is unsupported by the record. In so concluding, we are cognizant that our standard of review is very deferential to the PCRA court's credibility assessments. **See Mason**, **supra**. However, the PCRA court's credibility assessments are not absolute, and are still subject to review on appeal. **See id.** Importantly, the PCRA court's credibility determination **must be supported by the record**. **See id.**

Indeed, PCRA courts are required to analyze after-discovered evidence claims under the four-prong test outlined in section 9543(a)(2)(vi). **See Medina**, **supra**. Here, the PCRA court did not identify the after-discovered evidence test, much less discuss any of the prongs, except for a conclusory determination that "the court does not believe that the outcome of the trial would differ." PCRA Court Opinion, 12/15/22, at 7. In reaching this conclusion, the PCRA court did not discuss any facts of the case, or relevant case law. **See id.** at 1-7. The PCRA court did not analyze the discrepancies

between the testimony of Brittany and Marcus or address how Ingram's testimony impacts any portion of the case.[17] *See id.*

Moreover, some of the facts that the PCRA court employed to conclude that Ingram was not credible are facts that are supported by the jury trial transcript. In particular, the PCRA court noted that Ingram "opined that [Hereford] was not the same height as the person who forced his way into the victim's residence the night of the murder." *See* PCRA Court Opinion, 12/15/22, at 6. However, Ingram's "opinion" is corroborated by the testimony of Marcus and Brittany. *See* N.T. Jury Trial (Day 3), 8/3/11, at 375, 398-99. As we noted *supra*, Marcus testified that he identified the first gunman as Hereford, and that Hereford was not wearing a mask. *See id.* He also testified that the second gunman was taller than the first gunman, allegedly Hereford, who was the same height as Marcus, 5'10". *See id.* at 389. However, when Hereford stood back-to-back with Kirk at trial, Marcus testified that Hereford was significantly shorter than Kirk. *See id.* at 398-99. Accordingly, it is clear from this testimony that it is not Ingram's "opinion" that Hereford was not the same height as the first gunman, but rather a fact corroborated by other witnesses.

---

[17] We further observe that while the PCRA court's opinion is seven pages in length, it only reaches this length because the PCRA court addressed six claims raised in Hereford's Rule 1925(b) concise statement. *See id.* at 3 (listing Hereford's Rule 1925(b) claims). However, the PCRA court "addresses" each of these claims in a paragraph or less.

Additionally, the PCRA court discounts Ingram's testimony because he did not witness the shooting. *See* PCRA Court Opinion, 12/15/22, at 6. Nevertheless, Ingram observed the men for the period just prior to their entrance into the home. *See* N.T. PCRA Hearing, 2/17/22, at 16-24, 36-42. No other witness in this case testified about the perpetrators' actions prior to their entry into the home. Moreover, as we outlined *supra*, Ingram's testimony at the PCRA hearing is corroborated, in part, by the surviving eyewitnesses' testimony. Ingram saw two gunmen, both darker skinned with shirts covering their faces, one of whom covered his face utilizing two black shirts, one of whom appeared to be operating a cell phone prior to entering the home, and then, almost immediately after they entered the home, Ingram heard multiple gunshots. *See id.* at 18-20, 23, 37-39. This testimony is consistent with Brittany's trial testimony that two men burst into Jahard's home, brandished firearms, and opened fire. *See* N.T. Jury Trial (Day 1), 8/1/11, at 76, 79-81. Notably, Brittany testified that one of gunmen's faces was covered by two black shirts wrapped around his head. *See id.*

The PCRA court also found Ingram not credible due to his failure to report to police on the night of the incident and for failing to speak with Detective Kinavey. *See* PCRA Court Opinion, 12/15/22, at 6. However, Ingram provided credible explanations for his unwillingness to speak with authorities. Ingram testified that he was a known drug dealer and a trespasser in Crawford Village and did not come forward because admitting his presence as a known drug dealer at his girlfriend's house, in Section 8

housing, would cause her to lose her home.[18]  *See* N.T. PCRA Hearing, 2/17/22, at 36-37, 41; *see also* 42 U.S.C. § 1437f(d)(1)(B)(iii) (relating to Section 8 housing and providing that "during the term of the lease . . . any drug-related criminal activity on or near such premises, engaged in by a tenant of any unit . . . or any guest or other person under the tenant's control, shall be cause for termination of tenancy").

Regarding his refusal to speak with Detective Kinavey, Ingram testified that Detective Kinavey arrived at SCI Forest unannounced and attempted to interview him.  *Id.* at 55-56.  Ingram testified that he was afraid the other inmates would be able to see into the interview room and think that he was giving information to the police.  *See id.*  Ingram agreed to be recorded by Detective Kinavey "to tell him that I wanted to testify to the truthfulness" of the certified statement provided to PCRA counsel but that Ingram did not want to talk due to the presence of other inmates.  *See id.* at 57-59.[19]  Ingram testified that, after Detective Kinavey left SCI Forest, Ingram spoke with Hereford's PCRA counsel and conveyed his desire to be interviewed by

---

[18] Moreover, we note that neither trespass nor drug offenses qualify as *crimen falsi*.

[19] Detective Kinavey did record Ingram's brief statement at this time. However, when PCRA counsel attempted to introduce the recording, the Commonwealth objected to its omission and the PCRA court sustained the objection.  *See id.* at 52-54.  Consequently, it is not a part of the certified record before this Court.  Moreover, we observe that Detective Kinavey was present as a potential rebuttal witness at the PCRA hearing, but the Commonwealth chose not to call him to testify.  *See id.* at 4-5; *see id.* at 90 (Commonwealth stating they were not calling witnesses).

Detective Kinavey. *Id.* at 59-60. However, the Commonwealth made no second attempt to interview Ingram. Based upon the foregoing, and the PCRA court's cursory conclusions, we fail to see how the above testimony detracts from Ingram's credibility. On the contrary, Ingram's testimony at the PCRA hearing reveals that he had a legitimate concern that other inmates may misinterpret the unannounced police visit. Moreover, Ingram indicated his willingness to conduct a second interview, which the Commonwealth did not pursue.

Based upon the foregoing, we conclude that the PCRA court's credibility determination is unsupported by the record. Accordingly, we address whether Hereford has satisfied the four-prong after-discovered evidence test required to warrant a new trial.

Initially, as we concluded *supra*, Hereford could not have obtained Ingram's testimony with the exercise of due diligence for the purposes of satisfying the newly-discovered facts exception to the PCRA's time bar. For the same reasons, we conclude that Hereford has satisfied the first prong of the after-discovered evidence test.

Similarly, we conclude that Hereford has satisfied the second and third prongs of the test. Based upon our review, described at length *supra*, Ingram's testimony is corroborated **in part** by the testimony of Brittany and Marcus. Additionally, Ingram's testimony calls into question **some parts** of Marcus's testimony. However, Ingram's testimony is not purely for the sake of impeachment, nor is it entirely cumulative. Rather, as we detailed above,

- 22 -

Ingram is the only known witness to have seen the two gunmen prior to their entry into Jahard's home. Additionally, Ingram had unimpeded vantage points of both gunmen, and he could ascertain their approximate height, weight, and skin tone. *See* N.T. PCRA Hearing, 2/17/22, at 16-24, 36-42. No other witness presented this evidence. Consequently, we conclude that Hereford has satisfied the second and third prongs. *See Commonwealth v. Small*, 189 A.3d 961, 974 (Pa. 2018) ("If the new evidence is of a different and [']higher['] grade and character, though upon the same point, or of the same grade or character on a different point, it is not [']merely['] corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.").

Regarding the final prong, whether Ingram's testimony is likely to result in a different verdict, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, **and the overall strength of the evidence supporting the conviction**." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa. Super. 2010) (emphasis added). "[C]ases that have addressed [after-discovered evidence] have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it." *Id.* (quotation and citation omitted).

As we concluded above, the PCRA court's credibility determination was not supported by the record, and we emphasize that the PCRA court did not

analyze the overall strength of the evidence supporting Hereford's convictions. Further, as we summarized above, Ingram's testimony is supported by the record, and offers new probative evidence regarding the identification of the gunmen. Additionally, we note that at the PCRA hearing, Ingram testified that he was serving a 76-to-152-year sentence for homicide. *See* N.T. PCRA Hearing, 2/17/22, at 43, 50-51, 73-74. Ingram further testified that he was not testifying in the hopes of securing a more lenient sentence. *See id.* at 43; *id.* at 49 ("[Coming forward] doesn't benefit me but—it doesn't. Some type of way it makes me feel better because I'm coming to tell the truth basically. You know, knowing I know what was happening. But that's something that can weigh on your conscience, you know, something like this happened, for the victim's family, for [Hereford]'s family it's—you know, it kind of makes me feel better coming forward saying what happened[.]"). Ingram testified that no one paid him, intimidated him, incentivized him, or otherwise induced him to testify. *See id.* at 42-43. Ingram stated that he came forward because he knew Hereford was not involved in the June 15, 2010 homicide. *See id.* at 43; *id.* at 49 ("That's what made me come forward was because now it's more clear like well, I seen the shooter so I know [Hereford] wasn't the shooter."). Ingram further testified that he had originally believed Hereford was investigated, but not convicted of shooting the victims. *Id.* at 44-49.

Based upon our review of the record, the Commonwealth's theory that Hereford was one of the shooters largely relied upon Marcus's identification of

Hereford. However, as summarized at length throughout this memorandum, Marcus's identification was internally inconsistent, was at odds with Brittany's testimony, and would be at odds with Ingram's testimony. Furthermore, there is no forensic evidence linking Hereford to the scene of the murders.[20] Therefore, it is likely that Ingram's testimony that Hereford was **not** one of the shooters, would result in a different verdict. **See Medina**, **supra**; **see also Padillas**, **supra**. We conclude that Ingram's testimony is of such probative value, and is not merely cumulative or corroborative, and that it would likely result in a different verdict. Accordingly, we reverse the PCRA court's order denying Hereford's PCRA petition and remand for a new trial.

Order reversed. Case remanded for new trial. Jurisdiction relinquished.

---

[20] We note that, at trial, the Commonwealth also presented evidence of cell phone calls. **See** N.T. Jury Trial (Day 3), 8/3/11, at 436-44. The evidence at trial reflects that 13 to 16 calls were made from a cell phone number registered to Kirk, to a cell phone number registered to Hereford, immediately prior to and after the murders. **See id.** These calls were introduced into evidence by Detective Lane Zabelsky, a lay witness. **See id.**; **see also** Commonwealth Exhibits 209, 211, 212 (cell phone records). There was no expert testimony regarding the phone calls, no testimony or evidence regarding the location of the cell phones at the times these calls were made, and no testimony or evidence of what words, if any, were spoken. **See** N.T. Jury Trial (Day 3), 8/3/11, at 436-44 (Detective Zabelsky testifying exclusively based upon cell phone records that only document phone call dates, times, and durations). Consequently, we merely note that this was the only other evidence presented by the Commonwealth tending to demonstrate Hereford's involvement. Nevertheless, we conclude that it is irrelevant to whether Ingram's testimony is credible, constitutes appropriate after-discovered eyewitness evidence, or whether it would be likely to compel a different result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/9/2024